Lawrence A.F. FORD, et al., Plaintiffs,

v.

Charles W. MANUEL, et al.,
Defendants.

No. C 84–7060.

United States District Court,
N.D. Ohio, W.D.

Aug. 8, 1985.

Marc G. Williams-Young, and Thomas Karol, Toledo, Ohio, for plaintiffs.

Russell Rakestraw, Findlay, Ohio, for defendants.

## OPINION AND ORDER

JOHN W. POTTER, District Judge.

This cause came to be heard upon cross motions for summary judgment. Plaintiffs have filed opposition to defendants' motion. The American Jewish Congress has filed an *amicus curiae* brief in support of plaintiffs' position. The parties have filed stipulations, all but one of which are related to the 1983–84 school year in the Findlay City School District. The motions are based upon the stipulations as well as upon certain depositions and affidavits.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution. Plaintiffs are taxpayers and parents of children enrolled in the Findlay Public School System. They bring suit as a class action; the class has not been certified. Defendants are the Board of Education of the Findlay City School District, its superintendent, its officers and members. This lawsuit challenges defendants' policies and practices in relation to the conducting of religious classes in the Findlay Public Elementary Schools. Plaintiffs seek injunctive and declaratory relief.

The Findlay Board of Education, on August 28, 1978, adopted the Policy File KG authorizing community use of school facilities. (Stipulations filed October 3, 1984 at Stip. 25). Entitled "Community Use of School Facilities," the document states, in pertinent part:

> The Board of Education subscribes to the notion that the public schools are owned and operated by and for its patrons and that the schools are an integral part of the community.
>
> Authorization for use of school facilities shall not be considered as endorsement of or approval of the activity group or organization nor the purposes they repre-

sent ... School-sponsored activities shall have first priority. The right to authorize use of school facilities shall be retained by the Board and/or superintendent....

Stipulations, Exhibit E.

On September 10, 1979, the Findlay Board of Education approved the rental of elementary school buildings, either immediately before or after school hours, to the Findlay Weekday Religious Education Council (WREC) for $1.00 per year (Stip. 26 and Exhibit F).

The WREC sponsors religious education classes in the City of Findlay public elementary schools. During the 1983–84 school year, classes were conducted weekly in eight (8) of the ten (10) public elementary schools (Stips. 1 and 17). The classes were provided for fourth grade students in eight of the schools and for third grade students in three of the schools (Stip. 17). Weekday Religious Education (WRE) classes are conducted before and after the regular school hours. Morning WRE classes are conducted from 8:20 to 9:00 A.M. Secular classes at all Findlay public elementary schools begin at 9:15 A.M. (Stip. 2). Afternoon classes are conducted from 3:05 to 3:45 P.M. in some schools and from 3:20 to 4:00 P.M. in others (Stip. 17). Secular classes conclude at 3:00 P.M. and 3:15 P.M. respectively (Stip. 3). Attendance at the WRE classes is voluntary with parental permission required. Classes are taught by non-school personnel. In the Findlay City School District public elementary school principals, teachers and administrative personnel are required to be at school between 8:00 A.M. and 4:00 P.M. (Stips. 9, 10, 12, 13).

During the 1983–84 school year, advertisements for the WRE program were distributed in each elementary school.[1] The

---

1. A copy of the advertisement is found at Stip. Exhibit A. It states in part:

CHILDREN LEARN ABOUT GOD, JESUS, THE WORLD AND HOW TO UNDERSTAND AND GET ALONG WITH OTHERS! THE BIBLE IS USED AS THE RESOURCE ON MORAL AND PERSONAL VALUES.

THE BIBLE is used, also, to study God's presence throughout history, through a study of the lives of men and women and events it depicts. An attempt is made to acquaint the children with the stories of many of the Bible characters such as Moses, Elijah, Abraham,

distribution procedure was left to the discretion of each principal. In most instances, third and fourth grade homeroom teachers distributed the material (Stip. 19). Registration/permission slips (*Id.* at Exhibit B) were also distributed in the same manner. These slips were later collected in each elementary school. In five of the schools the slips were returned to the homeroom teacher, and in four they were returned to the WRE teacher at the first WRE session (Stip. 21). In some schools at the time of distribution of the advertisements and registration/permission slips, a WRE contribution envelope (Exhibit C) was distributed in the same manner as were the other materials (Stip. 22). These were later returned to the schools in a procedure which was left to each principal's discretion; in some schools, the envelopes were returned to the homeroom teachers, in others to the WRE teachers (Stip. 23).

All Findlay public schools have parent-teacher organizations (PTO). School personnel participate in an advisory capacity. The PTOs are devoted to the development of parental and community support for the schools. Funds are derived through membership contributions and/or fund raising projects and are used to purchase school-related items. Some PTOs contribute to the WREC (Stip. 24 and Exhibit D).

The Findlay City School superintendent apparently distributed Administrative Policy File KG–R to principals, school staff, and WRE personnel before the beginning of the 1984–85 school year. (See stipulation 29 and Exhibit I). This states:

## COMMUNITY USE OF SCHOOL FACILITIES

Previous practices of distributing and/or collecting Weekday Religious Education materials must cease. Effective this date, please advise all pertinent staff of the following:

1. Announcements/Flyers; Registration/Permission slips; and/or Contribu-

tion envelopes will not be distributed or collected by school personnel.

2. The principal will make student names/addresses (Directory Information) available as requested.

3. WRE may use school facilities as per policies of the Findlay Board of Education. Upon contact by WRE, principals are to make space available.

4. School personnel will not supervise WRE students.

5. WRE classes will not start less than five (5) minutes after the dismissal of classes in the afternoon.

6. WRE classes will end, at least five (5) minutes prior to the start of class in the morning.

adopted 8/31/84

Plaintiffs assume for purposes of their motion that the amended policies have been implemented for the 1984–85 school year. The Court makes the same assumption. Despite these changes, which significantly reduce the direct involvement of public school personnel in the WRE program, plaintiffs maintain that the WRE program violates the United States Establishment Clause of the First Amendment of the United States Constitution.

The First Amendment, in pertinent part, states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The religious clauses have been applied to the states through the Due Process clause of the Fourteenth Amendment. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Plaintiffs maintain that despite the implementation of the August 31, 1984 policy change, the basic structure and relationship between the defendants and the WRE program continue unchanged and are in violation of the Constitution.

---

Nehemiah, Paul and Peter and many others. The Parables of Jesus are also used. It is not

clear from the stipulations whether the same or a similar advertisement was used for the 1984–85 WRE program.

Plaintiffs argue that defendants' current policies and practices related to the WRE program give the perception of endorsement by the schools of religious instruction. Plaintiffs point out that the program is directed toward eight and nine year old children, a very impressionable age group. Plaintiffs maintain that the group's members are too unsophisticated to understand that programs held in the school building immediately before or after school are not necessarily part of the school's approved extracurricular program. Plaintiffs argue that Ohio's compulsory education machinery "provides" students for the religious classes. O.R.C. § 3321.01–.04. Plaintiffs also object to the program because they assert that contact between non-participating students and the WRE classes is inevitable, resulting in non-participating students receiving the "message" that school authorities endorse the WRE classes. Further, they view the financial contributions by the PTOs to the WRE program as having the effect of advancing religion.

Plaintiffs also believe that the program, even in its revised form, causes an excessive entanglement of the defendants in religion. They see the entanglement in the fact that school personnel are required to be on school premises during the times that the classes are held, and in the PTOs' financial support of the WRE program.

Defendants, quite obviously, view the constitutional implications of the program very differently. In support of their own motion for summary judgment, defendants emphasize that the involvement of public school personnel with the WRE program and its participants is slight. They maintain that school personnel would exercise supervisory authority over WRE students only should an "emergency situation" arise. They emphasize that a broad variety of both school-related and non-school-related groups regularly use the schools, under Policy KG (Stip. 25, Exhibit 3). These include political, business and social welfare groups.

Defendants argue that certain provisions of Chapter 3313 of the Ohio Revised Code mandate that public school facilities be made available for religious exercises, so long as certain criteria are met. Further, defendants assert that defendant Board of Education, via Policy KG and by its continuing policy of permitting the use of school facilities during non-school hours by private organizations, has created a public forum for First Amendment purposes. According to defendants, WRE's freedom of expression cannot be constitutionally restricted because of its religious content. Finally, defendants argue that the Board policy of equal access to school facilities does not violate the Establishment Clause in any respect.

Clearly, this is an area of law about which there is much concern among parents, taxpayers and lawmakers, as well as in the courts. It remains the frequent and difficult task of the courts to determine the constitutional validity of policies which in one way or another introduce religion into the school environment. See generally L. Tribe, *American Constitutional Law* §§ 14–1, 14–2.

The Court finds that the Establishment Clause of the First Amendment provides the controlling constitutional principles for the issues raised in this action. The Court's Establishment Clause analysis must be undertaken in the context of the Supreme Court's opinions in four Establishment Clause cases in the Supreme Court term just completed. *See Wallace v. Jaffree,* —— U.S. ——, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Alabama statute authorizing one-minute period of silence in public schools "for meditation or voluntary prayer" which was motivated by legislative purpose to endorse religion and by no clearly secular purpose, is a law respecting establishment of religion violative of First Amendment); *Estate of Thornton v. Caldor, Inc.,* —— U.S. ——, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (Connecticut statute granting employees absolute right not to work on their Sabbath has primary effect that advances particular religious practice in violation of Establishment Clause); *Grand Rapids School District v. Ball,* ——

U.S. ——, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (public school district programs under which public school teachers taught parochial school students in parochial schools, during and after regular school hours, have primary effect of advancing religion in violation of Establishment Clause); *Aguilar v. Felton*, —— U.S. ——, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (public school district program, using federal funds, under which school district pays salaries of public school teachers who teach remedial classes in parochial schools and monitors these classes for religious content excessively entangles district with religion in violation of Establishment Clause). The Supreme Court in the case of *Wallace v. Jaffree, supra,* again reminded district and circuit courts that they are, of course, bound to adhere to the Supreme Court's controlling decisions. This Court finds that the Supreme Court has strongly reaffirmed the so called *Lemon* test in its most recent analyses of constitutional questions in which the Establishment Clause is implicated. Three of the most recent Supreme Court actions dealt with the application of Establishment Clause principles in the context of elementary schools.

 In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), Chief Justice Burger, noting that the language of the First Amendment Religion Clauses is "opaque," wrote:

> ... we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: "sponsorship, financial support, and active involvement of the sovereign in religious activity."

. . . . .

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; sec-

ond, its principal or primary effect must be one that neither advances nor inhibits religion, ...; finally, the statute must not foster "an excessive government entanglement with religion." (Citations omitted.)

A statute or practice whose constitutionality is questioned on Establishment Clause grounds must pass all three parts of the *Lemon* analysis in order to be upheld. The Court assumes, as do plaintiffs, *arguendo,* that defendants' policies and practices have a secular purpose. Nonetheless, the Court finds that they have the principal or primary effect of advancing religion. They fail, in other words, the second prong of the *Lemon* test and are, therefore, violative of the Establishment Clause.[2]

In *Brandon v. Board of Education of the Guilderland Central School District,* 635 F.2d 971 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), *reh. denied,* 455 U.S. 983, 102 S.Ct. 1493, 71 L.Ed.2d 694 (1982), the Court discussed the attempt of students at a public high school to gain permission from the school's administration to conduct communal prayer meetings in a classroom. They wished to hold the meetings immediately before the school day commenced. The group did not seek faculty involvement, and student involvement was to be voluntary. The trial and appellate courts found that the school administration had properly denied the students' request. The Second Circuit stated that school authorization of the student-initiated voluntary prayer would have violated the Establishment Clause. Applying *Lemon* and noting that the "principal or primary effect test" is somewhat difficult to apply, the court framed the critical inquiry as follows: "does a particular policy which is neutrally applied to religious organizations merely accommodate religious interests, or does it advance those nonsecular interests impermissibly?" *Id.* at 978. The court conclud-

---

**2.** The Court finds no excessive entanglement as delineated in *Lemon v. Kurtzman, supra; Lynch v. Donnelly, infra; Americans United for Separation of Church and State v. School District of the* City of Grand Rapids, infra; Lubbock Civil Liberties Union v. Lubbock Indep. School District, infra.

ed that the requested prayer meetings would create an improper appearance of official support and that the prohibition against advancing religion would be violated.[3]

*Lubbock Civil Liberties Union v. Lubbock Indep. School District*, 669 F.2d 1038 (5th Cir.), *pet. for rehearing en banc denied*, 680 F.2d 424 (1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983), involved a public school district policy permitting students to voluntarily gather at school before or after regular school hours for "educational, moral, religious or ethical purposes." 669 F.2d at 1041, n. 7 at ¶ 4. Noting that there is a special concern for the religious neutrality of the American public educational system, the court applied the *Lemon* test and found that the policy in question passed no part of the three prong test. The inquiry used by the court under the primary effect test was "whether the consequence of the district's policy is to place its imprimatur upon religious activity." The court stated that:

> ... the articulated policy of allowing religious meetings at a time closely associated with the beginning or end of the school day implies recognition of religious activities and meetings as an integral part of the District's extracurricular program and carries with it an implicit approval by school officials of those programs. This, in combination with the impressionability of secondary and *primary* age school children and the possibility that they would misapprehend the involvement of the District in these meetings, renders the primary effect of the policy impermissible advancement of religion. (Emphasis in original.)

*Id.* at 1045. *See also Bender v. Williamsport Area School District*, 741 F.2d 538 (3rd Cir.1984); *cert. granted*, — U.S. —, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985). (School district's refusal to permit wholly student-initiated nondenominational prayer club to meet during regularly scheduled activity upheld.)

In *Grand Rapids School District v. Ball*, — U.S. —, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Supreme Court recently held, *inter alia*, that voluntary courses held at the end of the school day in sectarian elementary schools violated the Establishment Clause because the program had the primary or principal effect of advancing religion. Teachers of the classes were part-time public school employees, most of whom were full-time sectarian school teachers. The Supreme Court found that the program promoted religion in, among other ways, that "it may provide a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school." *Id.* at —, 105 S.Ct. at 3223–24.

Continuing its discusson of the symbolism of the union between government and religion, the Court turned its attention to the situation in which religious instructions were given in public schools. The Court noted that *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) stands for the proposition that voluntary religious instructions may not be given on public school premises as part of the school program, even if the instruction is given only by non-public school personnel. On the other hand, a similar program conducted during school hours but off of

---

**3.** Judge Irving R. Kaufman's introductory statement is particularly illuminating. It is as follows:

> In this immigrant nation of dreamers and dissidents, however, no broad consensus regarding the spiritual side of the human condition exists. Our Founding Fathers recognized the disharmony and drafted the Bill of Rights to require the separation of church and state. Accordingly religious activity under the aegis of the government is strongly discouraged,

and in some circumstances—for example, the classroom—is barred. The sacred practices of religious instruction and prayer, the Framers foresaw, are best left to private institutions—the family and houses of worship. In short, logic, tradition, and law create in our nation a "wall between church and state," *Everson v. Board of Education*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947).

*Brandon v. Board of Education of the Guilderland Central School District, supra*, at 973.

public school premises was upheld in *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). The different results in *McCollum* and *Zorach* can be explained in part, the Court in *Ball* states, by the difference in symbolic impact. *Id.* ── U.S. at ──, 105 S.Ct. at 3225–27.

Justice O'Connor, in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984) made a useful attempt at refining the *Lemon* test. She recently discussed one of her proposed Establishment Clause inquiries, her "endorsement test," in a concurrence in *Wallace v. Jaffree*, ── U.S. at ──, 105 S.Ct. at 2496–2500:

> Direct government action endorsing religion or a particular religious practice is invalid under this approach because it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." ... Under this view, *Lemon's* inquiry as to the purpose and effect of a statute requires courts to examine whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement.

In *Estate of Thornton v. Caldor, Inc.*, ── U.S. at ──, 105 S.Ct. at 2919, Justice O'Connor stated in concurrence:

> In my view, the Connecticut Sabbath law has an impermissible effect because it conveys a message of endorsement of the Sabbath observance.
>
> ... The message conveyed is one of endorsement of a particular religious belief to the detriment of those who do not share it. As such, the Connecticut statute has the effect of advancing religion, and cannot withstand Establishment Clause scrutiny.

Justice O'Connor made no inquiry concerning the purpose of the statute.

Justice O'Connor recently acknowledged that religion-related activities in public elementary schools are, in significant ways, different from other, unobjectionable, apparent government endorsements of religion:

> At the very least, Presidential proclamations [for public prayers of thanks] are distinguishable from school prayer in that they are received in a non-coercive setting and are primarily directed at adults, who presumably are not readily susceptible to unwilling religious indoctrination. This Court's decisions have recognized a distinction when government sponsored religious exercises are directed at impressionable children who are required to attend school, for then government endorsement is much more likely to result in coerced religious beliefs.

*Wallace v. Jaffree*, ── U.S. at ──, 105 S.Ct. at 2503–05 (O'Connor concurrence).

Likewise, Justice Brennan writing for the Court in *Grand Rapids School District v. Ball*, ── U.S. at ──, 105 S.Ct. at 3222 stated:

> We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children. The government's activities in this area can have a magnified impact on impressionable young minds....

Applying the principles set out above to the Findlay City School District's Policy KG, the Court finds that the Policy, as it applies to the rental to the WREC of elementary school buildings immediately before and after school hours for the holding of WRE classes, is unconstitutional. The Policy impermissibly advances nonsecular interests in that it creates, for impressionable eight and nine year old children, the appearance of official support for religion. The challenged use of the Findlay public elementary schools is inextricably bound up with the educational function of the public schools. The program falls outside the zone of what is constitutionally permissible because it takes place at times when the schools are being used in connection with the provision of public education. *See McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Teachers and administrators are required to be present from 8:00 A.M. until 4:00

P.M. They are undoubtedly performing educational functions during this time, are visibly present, and have direct contact with the WRE students in the event of emergencies. The presence of school personnel, performing their official duties, the juxtaposition of religious classes and secular classes, and the use of public school facilities combine to give young children— including those present for the WRE classes, those present in the school for other extracurricular activities, and those who are not present but who are aware that WRE classes are being held—the erroneous impression of official school support. *Brandon, supra; Lubbock, supra; Grand Rapids School District v. Ball, supra. See also Americans United for Separation of Church and State v. School District of the City of Grand Rapids,* 718 F.2d 1389 (6th Cir.1983).

■ Because these classes are held immediately preceding or following public school classes, attendance at them directly benefits from the operation of Ohio's compulsory education law. Students who are present at school for the WRE classes will shortly be compelled to be there, or they have just completed their compulsory course of study. Religious instruction may not so benefit from compulsory school laws. See *McCollum,* 333 U.S. at 212, 68 S.Ct. at 465–66. In *Lubbock Civil Liberties Union,* 669 F.2d at 1046, the court stated:

> The District claims that the compulsory education machinery is not involved; thus there is no advancement of religion. We find, however, that it is the Texas compulsory education machinery that draws the students to school and provides any audience at all for the religious activities, whether the buses have run or the school day has "officially" begun. The distinctions drawn by the District to support its claim of no advancement do not withstand scrutiny. Rather, the critical factors are the District's use of its compulsory education machinery, which provides students available to attend even voluntary meetings, and its implicit support and approval of the religious meetings.

The use of public school facilities by the WRE program is different in its constitutional implications from the use of school facilities by Boy Scouts or the other secular extracurricular groups which use the facilities immediately before or after school. There is, obviously, no constitutional imperative mandating a "wall of separation" between the State and recreational, charitable or political groups. The constitutional significance of WRE program also is different from that of the use of school facilities by church groups on Saturday afternoons and weekday evenings. *See* Stipulations, Exhibit G wherein it is stated that the Worldwide Church of God uses public elementary school facilities every Saturday from 9:00 A.M. to 1:30 P.M. for religious services and every other Tuesday, from 6:30 P.M. to 9:30 P.M. for Bible Study. The message of state support for religion is weak or nonexistent as it relates to the Worldwide Church's use of public school facilities. Presumably no school children would be present at the time of these meetings, unless brought by members of their family to attend the service. School personnel would not be present. Compulsory school attendance laws obviously are not implicated.

■ Defendants argue that the Findlay public schools are public forums and that they may not constitutionally discriminate against the WRE program because of its religious content. This argument must fail. Public schools are not in the limited class of traditional public forums, such as streets, sidewalks and parks. The essential element of a traditional public forum is lacking. Nor is there a basis in the stipulations before the Court from which it can determine that the Findlay City Schools are limited public forums during the hours in which the school buildings are in use as such.

Defendants argue that certain Ohio statutes mandate that the School Board allow the conducting of the WRE classes. O.R.C. § 3313.75 provides that a board of education may authorize the opening of schoolhouses for any lawful purposes. O.R.C. § 3313.77 provides, in pertinent part, that boards of education

shall ... permit the use of any schoolhouse and rooms therein ... when not in actual use for school purposes, for any of the following purposes:

(B) Holding educational, religious, civic, social, or recreational meetings and entertainments, and for such other purposes as promote the welfare of the community; provided such meetings and entertainments shall be nonexclusive and open to the general public;

The statutes in question do not require or allow the Findlay Board of Education policy which is at issue here. As discussed above, the schools are in "actual use for school purposes," school personnel being required to be present, at the times in question. The Ohio statute does not authorize or require religious groups to teach religious classes to public elementary school students during the school day, immediately before and after the official school hours. If it did so, it would be unconstitutional.

■ The Court does not find the fact that some PTOs have contributed to the WREC to be a violation of the Establishment Clause. Stipulation Exhibit D indicates that in the 1983–84 school years four PTOs made contributions of between $25.00 and $150.00.

■ It is obvious that not every government policy which benefits church-sponsored activities violates the Establishment Clause. Decisions by the Supreme Court have, for example, allowed substantial sums to be spent in ways which directly benefit religious institutions. *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). See also *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) in which the Supreme Court found that, notwithstanding the religious significance of a Nativity scene, its display by a municipality did not violate the Establishment Clause.

The Court's ruling is narrow. In finding that the WRE program violates the Establishment Clause, the Court notes the location and timing of the classes as well as the tender and impressionable ages of the children who are, one way or another, whether or not participants, in contact with the program.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that defendants' motion for summary judgment be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that defendants, and all persons acting in concert with them, be and they hereby are enjoined from the continued application of Policy KG as it applies to the utilization of public school buildings for the purpose of religious instruction at times closely related to the opening and closing of the official school day; and it is

FURTHER ORDERED that all other motions pending this action be, and they hereby are, DENIED as moot.