**Mellissa QUAPPE, et al., Plaintiffs,**

v.

**Joseph I. ENDRY, et al., Defendants.**

**No. C–2–88–0872.**

United States District Court, S.D. Ohio, E.D.

Sept. 10, 1991.

---

Robert Melnick, Rutherford Institute and Juan Jose Perez, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for plaintiffs.

William Henry Jones, Crabbe, Brown, Jones, Potts & Smith, Columbus, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, Senior District Judge.

This matter comes before the Court to consider the cross motions for summary judgment. Fed.R.Civ.P. 56. In this action the plaintiffs charge the defendant school system with an unconstitutional restraint upon their first, ninth, and fourteenth amendment rights by prohibiting their religious organization from a meeting time of their choice at Herbert Mills Elementary School (hereinafter "H.M.E.S."). The plaintiffs, fifth and sixth grade students at H.M.E.S., bring suit pursuant to Rule 17(c) by and through their next-of-friends.[1] Both parties seek declaratory and injunctive relief as well as costs and attorney fees pursuant to 42 U.S.C. § 1988.

This case is about a School Board's decision to require a student bible study to meet at 6:30 p.m. instead of 3:45 p.m.; it is also about the conflict between the free speech and establishment clauses of the first amendment. The plaintiffs are members of a group known as The Good News Club, (hereinafter "the Club"), which is affiliated with the Child Evangelistic Fellowship, an organization based in Warranton, Missouri. Meeting weekly, members of the Club engage in bible study, songs, and social activities, the purpose of which is to teach them the fundamentals of the Christian faith and to encourage a conversion experience. Interrogatory to Plaintiffs # 11.

The Club was founded in the 1970s by Roberta Penwell, a teacher at the school, and has met continuously since that time. Mrs. Penwell was the leader of the Club until 1981. Beginning with only three children, the Club now has a regular membership of approximately forty, comprised primarily of fifth and sixth graders from the school. From its inception, the Club met weekly at 3:30 p.m. immediately following the close of classes on school property. As with other after-school activities,[2] the Club was required to apply annually for permission to use the facility, such permission being within the discretion of the school and routinely given.

Although leadership of the group is shared among seven adults, none of whom are employed by the school, Mrs. Penwell has continued to play a significant role in the Club's existence. For example, she greets children at the start of each meeting, takes attendance, and assists in distributing materials for class projects. In addition, she has in the past been active in Club recruitment. In her capacity as a teacher, and during her regularly scheduled classes, Mrs. Penwell has also recited prayers on special occasions, permitted a moment of

---

1. The plaintiffs in this case are Mellissa Quappe by and through her mother Dorothy Quappe; Debbie Quappe by and through her father Paul Quappe; Heidi Durig by and through her father David Durig; Julian and Jermaine Smith by and through their mother Gwendolyn Smith; John and Joseph Heitzenreiter by and through their parents Gerald and Theresa Heitzenreiter; Stacey Capehart by and through her mother Connie Capehart; and Raymond and Marie Helman by and through their parents Craig and Margaret Helman.

2. Other groups are also granted permission to use the school building. These include: Girl Scout Troop # 339 from 3:30–5:00 p.m. each Wednesday; "Just Say No To Drugs" each Thursday at 3:30 p.m.; the Brownies (Seal of the Girl Scouts) each Thursday from 6:00–7:30 p.m.; the Reynoldsburg High School Cheerleaders at various hours; Boy Scouts Troop # 68 from 6:30–8:30 p.m. the third Tuesday of the month; St. Pius School Volleyball from 6:00–8:00 p.m. on various dates; Youth Basketball from November through February between 6:00–10:00 p.m.; and Youth Football the third Tuesday of each month.

silence after the pledge of allegiance, allowed religious material to be placed on a table in her classroom, displayed religious sayings on her wall, distributed bibles to her class, and invited her students to attend Club meetings.

As a result of complaints received by the school about her classroom activity, in June of 1987 Mrs. Penwell was questioned about her behavior and apprised of the school's concern about the constitutionality of her actions, ultimately receiving a written warning stating that her employment would be jeopardized if she persisted in such behavior. Subsequent to the meeting, Mrs. Penwell submitted an application on behalf of the Club for use of a school room for the 1987–88 school year, for the usual meeting time of 3:30 p.m. In an effort to avoid the appearance that the Club was sponsored in whole or in part by the school, on August 24, 1987, Joseph Endry, the Superintendent of the Reynoldsburg City School District, denied Mrs. Penwell's request for the starting time, granting instead permission for use of the room to commence at 7:30 p.m. The school reasoned that a separation between the close of classes and the commencement of the Club would diminish the appearance that the Club was sponsored or approved by the school. The Club appealed the decision, and the Board decided to allow meetings to commence one hour earlier, at 6:30 p.m.

The plaintiffs argue that the 6:30 starting time constitutes content-based discrimination against them, violative of fundamental rights of free speech, freedom of association and assembly, and the free exercise of religion. They do not argue that the facilities are closed to them; rather, they assert that because the appointed meeting time is unreasonable, they are dependant upon parents in the community to open their homes in order to meet at a more reasonable time. The inconvenience to the children, it is argued, has relegated them to the status of second class citizens. The defendants, on the other hand, argue that the later meeting time was necessary to demarcate clearly between school and non-school functions brought about by the symbolic nexus between the Club and the school forged by Mrs. Penwell's participation in Club activities. The time, it is argued, constitutes a reasonable accommodation of the Club as demanded by establishment clause principles.

In considering the parties' motions, the Court is mindful that summary judgment is appropriate only in limited circumstances. Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The United States Supreme Court has held, however, that the standard of summary judgment "mirrors the standard for a directed verdict under Federal Rule of "Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This is true where, for instance, the dispute turns only on a legal question and the moving party must prevail as a matter of law even if the Court were to resolve all factual disputes in favor of the non-moving party. *Miller v. Consolidated Aluminum Corp.*, 729 F.Supp. 1154, 1155 (S.D.Ohio 1990); *see Ross v. Franzen*, 777 F.2d 1216, 1222 (7th Cir. 1985); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 225, at 79 (2d ed. 1983).

A summary judgment motion also requires special treatment of the record. The Court "must view the evidence presented through the prism of the substantive evidentiary burden" and determine "whether reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252, 254, 106 S.Ct. at 2512, 2513; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, in making this determination the Court may not impinge upon the proper function of the jury. Therefore, all of "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. With this standard in mind, the Court will address the cross motions for summary judgment.

■ As an initial matter, the plaintiffs assert that the school is a limited public forum thus subjecting the defendants' actions to strict scrutiny. The Supreme Court has identified three types of fora for purposes of free speech analysis: (1) the traditional public forum; (2) the public forum created by government designation; and (3) the non-public forum. *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 572, 107 S.Ct. 2568, 2570, 96 L.Ed.2d 500 (1987) (citing *Perry Educ. Ass'n. v. Perry Local Educs. Ass'n.*, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-955, 74 L.Ed.2d 794 (1983)). Public schools generally, and elementary schools in particular, are not considered to be traditional public fora. *Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir.1988) (citing *Brandon v. Board of Educ.*, 635 F.2d 971, 980 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981)) (holding that a high school is not a public forum, thus precluding free airing of religious views). However, a state is free to open to the public facilities which formerly were private if it and the locality, by policy or practice, open the forum to "indiscriminate use by the public," *Perry*, 460 U.S. at 37, 103 S.Ct. at 948, or to use by a specific segment of the public, such as a student organization. *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1983). "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound to the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. In such a forum, reasonable restrictions on time, place, and manner are permissible, and any content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar*, 454 U.S. at 269-70, 102 S.Ct. at 274-75.

■ Under the limited public forum analysis, the contested property remains a non-public forum as to all unspecified uses, *Perry*, 460 U.S. at 48, 103 S.Ct. at 956; *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985), and the exclusion of uses, even if based upon the subject matter of the speaker's identity, need only be reasonable and viewpoint neutral to pass constitutional muster. *See Jews for Jesus*, 482 U.S. at 573, 107 S.Ct. at 2571; *Perry*, 460 U.S. at 46, 103 S.Ct. at 955; *Deeper Life Christian Fellowship*, 852 F.2d at 680.

■ In order to determine whether a given forum is public or non-public, three factors are relevant to the Court's inquiry. First is the intent of the state. *Deeper Life Christian Fellowship*, 852 F.2d at 680 (citing *Calash v. City of Bridgeport*, 788 F.2d 80, 83 (2d Cir.1986)). Evaluation of the policy and practice of the government to ascertain whether it intended to open a place not traditionally open to the public is probative of the appropriate designation of the forum. *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1371 (3rd Cir.1990) (citing *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3447).

■ The second factor, derivative of the first, is the nature of the property and its compatibility with expressive activity. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448; *Gregoire*, 907 F.2d at 1371. The Court may not infer that the state has intended to create a public forum where the nature of the property is inconsistent with expressive activity. *Cornelius*, 473 U.S. at 803, 105 S.Ct. at 3449 (citing *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)).

Finally, it must be determined, by examining the policy and practice of the local school board, whether "use of its facilities is 'open to all comers,' or whether it has been limited by well-defined standards tied to the nature and function of the forum." *Gregoire,* 907 F.2d at 1371 (citation omitted). Thus the Court will look to the consistency with which the facilities have been made available to groups at large as well as the specific procedure employed by the school in determining who will receive such permission.

The starting point for resolution of the question whether H.M.E.S. is a limited public forum (or a public forum by government designation) is examination of the intent of the Ohio state legislature. Ohio Rev.Code sections 3313.76 and 3313.77 govern the uses to which schools may be put. Section 3313.76 provides:

> upon application by any responsible organization ... all school grounds ... as well as other buildings under the supervision and control of the state ... shall be available for use as social centers for the entertainment and education of the people, including the adult and youthful population, and for the discussion of all topics tending to the development of personal character and of civic welfare, *and for religious exercises.*

(Emphasis added.) Thus state law identifies four distinct activities to which its school properties may be put: entertainment, education, general discussion promoting personal character and civic duty, and religious exercises.[3] Though broadly stated, the Ohio legislature has indicated its preference for religious activities within its schools, subject of course to constitutional parameters. More important, the sweep of the statutory language encompasses virtually all kinds of expressive activity. The facial preference evinced by the statute suggests that the policy of the state is to designate its schools as public fora as to each of the enumerated categories.

This does not resolve the question, however, for it remains to be seen whether the practice of the state has been consistent with its policy. The plaintiffs have provided the Court no guidance on this matter. Nevertheless, section 3313.77 designates local school boards as the final arbiters of permissible uses for the school facilities under their respective jurisdictions, which includes rental of school buildings for religious meetings. Section 3313.77 provides in part:

> The board of education of any city, exempted village, or local district shall, upon request and reasonable fee, subject to such regulation as is adopted by such board, permit the use of any schoolhouse and rooms therein and the grounds and other property under its control, *when not in actual use for school purposes,* for any of the following purposes:
>
> .     .     .     .     .
>
> (B) Holding educational, religious, civic, social or recreational meetings and entertainments, and for such other purposes as promote the welfare of the community; provided such meetings and entertainments shall be nonexclusive and open to the general public.

(Emphasis added.)

However, the statutory mandate has been interpreted to foreclose the use of school property for religious meetings which occur immediately before or after regular class hours. In *Ford v. Manuel,* 629 F.Supp. 771 (N.D.Ohio 1985), the court observed that "[t]he Ohio statute does not authorize or require religious groups to teach religious classes to public elementary school students during the school day, immediately before and after the official school hours. If it did so, it would be unconstitutional." *Id.* at 779. This result flowed in part from the court's conclusion that such activity would take advantage of the compulsory attendance laws of the state in order to generate students for the

---

**3.** Heeding the admonition of the Supreme Court in *Widmar,* the Court makes no distinction between religious worship and religious instruction; rather it is presumed the designation of

"religious exercises" is meant to encompass all manner of religious expression. *Widmar,* 454 U.S. at 271 n. 9, 102 S.Ct. at 275 n. 9.

classes. *Id.* at 778. Such a result was neither intended by the statute nor allowable under precepts of constitutional law. Moreover, the statute directed that none of the enumerated activities could occur unless the facility was not being used for school purposes. The presence of faculty members in the building attending to employment-related duties rendered such use impermissible under the statute. *Id.* at 779. *See also* 82 Ohio Jur.3d, Schools, § 152 at 347. Accordingly, the court concluded that the statute, in practice, established limits on the time, place, and manner of the expressive activities that could occur on school property. This Court agrees, and concludes that the policy and practice of the state is to allow a broad spectrum of religious activity on public school property, subject to the limitation that such activity take place only during those times the building is not being used for school purposes.

The next step of the inquiry, which is designed to animate the question of the intention behind the state's policy, requires examination of the nature of the forum to determine its compatibility with expressive activity. *See, e.g., Widmar,* 454 U.S. at 267–68 n. 5, 102 S.Ct. at 273–74 n. 5; *Tinker v. Des Moines Independent School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Once again, the plaintiffs fail in their motion to address this aspect of the inquiry. Other courts addressing this question, however, have examined the function of the property in light of its historic place in society. For example, in *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the court was faced with a union of prison inmates whose organizational attempts were thwarted by state prison officials. Rejecting the inmates' first amendment claims, the court found it well established that "the fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarcer-

ation." *Id.* at 125, 97 S.Ct. at 2537. This result obtained because any constitutional interest "must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed." *Id.* (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Thus the nature of the penal institution demanded that first amendment rights be subordinate to the transcendent policies incarceration was meant to promote.

In the present case, the inherent nature of an elementary school, populated as it is by children of tender years, is one ill-suited to a limitless potpourri of expressive activity. It has been widely recognized that the impressionability of young children and the unique role played by elementary school teachers in education and socialization create special dangers which demand an extra measure of diligence in judicial oversight. *Edwards v. Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987) (trial courts must be "particularly vigilant in monitoring the Establishment Clause in elementary and secondary schools"). In *Bell v. Little Axe Ind. School Dist. No. 70,* 766 F.2d 1391 (10th Cir.1985), the court distinguished university and high school campuses from elementary schools, stating as follows:

> Elementary schoolchildren are vastly more impressionable than high school or university students and cannot be expected to discern nuances which indicate whether there is true neutrality toward religion on the part of a school administration. A child, for example, is unlikely to distinguish between school sponsorship and mere faculty supervision.

*Id.* at 1405 (footnotes omitted). The court based its conclusion on the expert testimony of a child psychologist who asserted that a child between the ages of 6 and 11 lacks the cognitive ability to appreciate the difference between his point of view and that of another child. *Id.* at 1404 n. 11.[4]

---

**4.** The court was moved to note that it was unsure whether anyone was capable of discerning school sponsorship of religious activities. *Bell,*

766 F.2d at 1404 n. 12. Indeed, given the complexity of the clash between free speech, free exercise, and establishment clause cases gener-

er

The defendants cite numerous decisions which have recognized that which is manifest to the intellect: Young children are uniquely susceptible to the leadership and influence of those authority figures by whom they are surrounded. An elementary school is by its nature and historical mandate a protected enclave for the regulated nurture of its students, empowered "to play an inculcation role and families entrust [them] with the education of their children" *Gregoire,* 907 F.2d at 1380; it is a universe away from the robust intellectual forum of the nation's universities. Therefore, the Court concludes that an elementary school is a forum inconsistent with unfettered expressive activity. Thus, while the state policy can be said to create a limited public forum for expressive purposes, the nature of the forum here at issue is one which is incompatible with unlimited expressive activity. Because intent to create a public forum will not be inferred where the nature of the property is inconsistent with expressive activity, *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448, the Court concludes that the state never intended to open its elementary schools as public fora.

The plaintiffs oppose the conclusion that elementary school children are impressionable. Instead, they have introduced the affidavit of Dr. David Miller, Ph.D., a practicing psychologist in Reynoldsburg, Ohio, for the novel proposition that "the Plaintiffs, and children their age, can distinguish between government sponsorship and private sponsorship." Plaintiffs' memorandum Contra at 13. From this they suggest that the Court should not take judicial notice of the impressionability of children based upon the *Bell* case. That case, they argue, is distinguishable because the testimony was given nearly ten years ago, and because it dealt with children from Oklahoma and not Ohio.

The Court rejects the plaintiffs' contention. First, the affidavit does not support the broad contention for which they contend. Dr. Miller limited his conclusion about children's ability to distinguish state from private sponsorship to those children he actually interviewed: the plaintiffs.[5] Second, Dr. Miller only interviewed six of the ten plaintiffs, thus further reducing the sample group from which he derived his conclusions and correspondingly diminishing the efficacy of his conclusion. Third, the children's answers to the initial interrogatories contradict Dr. Miller's findings, thus suggesting that the "clear" understanding now possessed by the children is a function of their exposure to the merits of this case, and not a previously unnoticed depth of understanding innate in youthful intellect.[6] Fourth, as the defendants note, by the time Dr. Miller interviewed the plaintiffs, they were older than the age group the plaintiffs argue is capable of discerning the difference between private and government sponsorship. Plaintiffs Debbie Quappe, Heidi Durig, Jermaine Smith, and Julian Smith were 13, 14, 12, and 14 respectively. Yet the age group at

---

ally, there are few who have successfully scaled these heights without significant intellectual exertion.

5. Dr. Miller stated as follows:

It is my conclusion that the children, as well as their respective parents, can make a clear distinction between the Club, as volunteer-sponsored club, and other activities that are school-related, sponsored or supported in some way by the school. Despite school officials suspecting confusion by the children, there appears to be no supportive data to validate this suspicion. In fact, quite the contrary. They seem to have a clear understanding of school-sponsored activities as compared to activities not supported or sponsored by the school.

Miller Aff. at ¶ 16.

6. For example, only some of the children indicated that they knew who the leaders of the Club were. *See* Interrogatories of Melissa Quappe, Debbie Quappe, and Stacey Capehart at ¶ 10. Those children identified Roberta Penwell as a leader of the Club. Yet the majority of children stated that they did not know who the leaders were. *See, e.g.,* Interrogatories of Jermaine Smith, John Heitzenreiter, Joseph Heitzenreiter, Julian Smith, and Heidi Gurig at ¶ 10. By the time Dr. Miller interviewed the plaintiffs, however, all of them were able to identify the organizers. Miller Aff. at ¶ 13. No explanation is offered by the plaintiffs to explain how, in the intervening time between the interrogatories and the interviews, Jermaine Smith, Julian Smith, and Heidi Durig learned who the organizers were. Such an inconsistency undercuts the veracity of Dr. Miller's conclusions.

H.M.E.S., and the group whom the plaintiffs argue is not impressionable, is comprised of children ages 5 through 10. Therefore, any conclusions based upon the interview responses of older children are irrelevant to the conclusion asserted by the plaintiffs. Finally, and perhaps most important, the Court's concern extends beyond the children who are parties to this case. The constitutional dimensions implicated here affect all of the children at H.M.E.S., not merely the plaintiffs. Even if the proffered expert testimony were valid, it strains credulity to suggest that a ten-year old child, not to mention a five-year old, could possibly have the cognitive function and the Solomonic wisdom to discern questions of the jurisprudential complexity posed here. Although the courts continue to lower the age at which students are capable of participating fully in the marketplace of ideas, *see, e.g., Widmar* (recognizing a university campus as limited public forum) and *Gregoire* (recognizing a high school as limited public forum and the ability of students to participate in such a forum), it is an exercise in *reductio ad absurdum* to extend this participation to grade-schoolers. The argument and the affidavit to support it are simply an attempt to create an issue of fact where none exists.

The foregoing examination of the practice and policy of the state is inconclusive, given the contradiction between the facial meaning of the relevant statutes and the practice as it has been judicially defined, and the conclusion that the nature of an elementary school is incompatible with unfettered expressive activity.

Turning to the practice and policy of the school board, the same result obtains. It is beyond purview that the policy of the Reynoldsburg School Board was to open its school facilities to a broad spectrum of the general public. The policy of the Reynoldsburg School Board provides in part:

The schools can provide a service as a community center in the promotion of the cultural and educational life of the community. To meet this end, the schools will be available for worthwhile educational, recreational, civic and cultural activities.

School District Facility Policy, Complaint Ex. A (hereinafter "the policy"). In *Gregoire,* the dissent noted that as long as a school board makes clear its intent through written rules that are consistently followed, it may have an access policy that provides for generous use of the buildings while limiting the use as to some groups on content-based grounds absent a compelling interest. *Gregoire,* 907 F.2d at 1386 (Stapleton, J., dissenting). However, the language of the Reynoldsburg board policy lacks any indication that it meant to limit or foreclose access to its facilities in any meaningful way. There is no limiting or excluding language, nor is there any attempt to define the contours of the kinds of uses thought to be permissible. Instead, the Board has articulated a policy which, if taken alone, would appear to create a limited public forum.

■ The plaintiffs fail, however, to advance any evidence with respect to the consistency with which the policy was applied. Instead, review of the deposition transcripts reveals that the plaintiffs asked few questions addressing this issue of the deponents, and those that were asked were at best cursory. *See, e.g.,* Seckel Dep. at 2, 43, 48–51; Endry Dep. at 23–24, 33–34. Neither is there any testimony describing whether there was substantive content-based review of the applications for use of the property. Nor can it safely be concluded that granting access to the Club was, without more, conclusive of the creation of a limited public forum. *See Deeper Life,* 852 F.2d at 680–81. The Court cannot conclude, given the inconclusive nature of the evidence before it and the importance of the question, that H.M.E.S. is a limited public forum. Because the evidentiary basis for determination of the status of the forum is inconclusive, the plaintiffs' motion for summary judgment as to this issue cannot be granted. However, even were the Court to conclude that H.M.E.S. was a limited public forum, thus subjecting the defendants' actions to strict scrutiny, their actions would nevertheless pass constitutional muster.

Under strict scrutiny, the defendants' actions will be upheld by this Court only if

they can show that the content-based restrictions are necessary to serve a compelling state interest and narrowly tailored to achieve that end. *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–49. The defendants argue that the board's interest in complying with their obligations under the establishment clause is precisely the type of compelling interest the aggrieved restriction was meant to serve. *Widmar,* 454 U.S. at 271, 273, 102 S.Ct. at 275, 276; *Bell v. Little Axe Ind. School Dist.,* 766 F.2d 1391, 1407 (10th Cir.1985).

The establishment clause provides in part that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. 1, cl. 1. Applicable to the states through the fourteenth amendment, *see Everson v. Bd. of Educ.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court long ago stated

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go or to remain away from a church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.... Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Thomas Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and state."

*Everson,* 330 U.S. at 15–16, 67 S.Ct. at 511–512. Thus the state is to refrain from engaging in or encouraging activity that could be understood to make it a partisan in religious matters. This neutrality is a decidedly double-edged sword, however, for just as the state may do nothing to advance religion, neither may it do anything which would inhibit religion. *Wallace v. Jaffree,* 472 U.S. 38, 85, 105 S.Ct. 2479, 2504, 86

L.Ed.2d 29 (1984) (Burger, C.J., dissenting); *Lynch v. Donnelly,* 465 U.S. 668, 692, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *Abington School Dist. v. Schempp,* 374 U.S. 203, 306, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring); *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) ("The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion.") Rather, the state is to maintain a benign neutrality in all religious affairs.

In order to determine whether the state has succeeded in preserving this often precarious balance, the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) established a three-part analysis to test the efficacy of governmental activity in religious matters. In order to pass constitutional muster the aggrieved statute or policy must have a secular legislative purpose; its principal or primary effect must be one that neither advances nor inhibits religion; and it must not foster excessive governmental entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted). The purpose and effect prongs of the analysis are properly viewed as counterparts to one another.

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.

*Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Thus the *Lemon* test has been refined to sharpen the inquiry to determine whether the governmental action has endorsed religion.

*County of Allegheny v. A.C.L.U.*, 492 U.S. 573, 593–94, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989). Endorsement has been found where governmental action has been found to favor or prefer a particular religious belief, *Jaffree*, 472 U.S. at 70, 105 S.Ct. at 2497, to promote one religious theory over another, *Donnelly*, 465 U.S. at 691, 104 S.Ct. at 1368, or has shown favoritism toward a religious belief, *Schempp*, 374 U.S. at 305, 83 S.Ct. at 1615.

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits the government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community.

*County of Allegheny*, 492 U.S. at 593–94, 109 S.Ct. at 3101.

With respect to the first prong of the test, the plaintiffs concede that the purpose of the access policy is secular, and thus not violative of the establishment clause. Having thus established that the intent of the school board is permissible, the question becomes whether, under the effects prong, the policy in practice conveys official disapproval of religion.

The plaintiffs argue that a voluntary bible study which meets directly after school, if allowed to meet on the same terms as other groups, in no way implicates state sponsorship of religion. Absent active participation by the government itself, any inference of endorsement is merely an incidental effect of the policy which allows the meeting. The Club, they argue, is entitled to access in the same manner as all other groups, and failure to allow such access demonstrates impermissible hostility toward religion.

The Court disagrees. First, the defendants have not denied access to the Club. To the contrary, they have allowed the Club to use the building without any restriction on the content of the Club's speech. The Club was never told to refrain from bible study, prayer, singing, or worship, nor is it alleged that the school administration in any way attempted to discourage the children from participating or en-

couraging others to do so. The Club is free to use the school building to engage in religious activities without fear of reprisal or threat of suspension of the privilege. Any inconvenience the children might encounter in getting to and from meetings is merely incidental to the meeting time, and is a burden shared equally, and without complaint, by numerous other children participating in other after-school organizations. Indeed, the fact that many other organizations are required to meet during this time period militates against a finding that the Club has been "relegated to second class status" as the plaintiffs contend. Therefore, there is nothing in the defendants' application of the access policy which demonstrates official hostility toward the Club, the content of its speech, or religion in general.

Moreover, granting the plaintiffs' requested meeting time would, under the facts of this case, violate the establishment clause, thus rendering the practice to be unlawful and in contravention of the authorizing Ohio statutes. Although the plaintiffs' argue that allowing access to the building does nothing to endorse religion, they ignore the active participation of Mrs. Penwell, which tainted the Club's activity and established a symbolic nexus between the school and the Club, thus providing the active government participation necessary to find a constitutional violation.

As has been established, Mrs. Penwell used her classroom as a forum for dissemination of her religious views. Her status as a teacher, aided by the institutional formality of the classroom, created the very appearance of state sponsorship the first amendment forbids. She also used her class to recruit members for the Club. Her participation in the Club, therefore, created a substantial danger that Club members would view the Club as an officially endorsed extension of the regular school day. The danger that the children of H.M.E.S. would understand the Club to be under the aegis of the school would be so great under such a circumstance, that allowing the Club to meet at 3:45 would constitute impermissible endorsement of religion.

The School Board, however, is duty bound to assure not only that Club mem-

bers understand that the School does not endorse their activity, but that those children who are not members of the Club do not feel ostracized for their choice not to participate in the Club. The Board's decision to break the continuity between the end of the school day and the Club's meeting time, far from exhibiting hostility, demonstrates the type of accommodation of religious activity demanded under the establishment clause, and is consistent with the approach taken by other courts faced with this dilemma.[7] The defendants have demonstrated the existence of a compelling interest (avoiding a violation of the establishment clause), and have adopted a policy of accommodation which satisfies that interest in a manner that is minimally intrusive on the rights of the plaintiffs and avoids excessive entanglement in the Club's affairs. Accordingly, the plaintiffs' motion for summary judgment must be denied.

■ The plaintiffs have elected not to respond to the defendants' motion for summary judgment on the other constitutional claims and are therefore deemed to have abandon them. In addition, the plaintiffs assert violations of their statutory rights under sections 3313.75, .76, and .77 of the Ohio Revised Code. The Court's conclusion that the statutes allow the use of school facilities for lawful activity, in conjunction with the conclusion that the use for which the plaintiffs contend is, under the facts here presented, unlawful, requires that these claims also be rejected.

■ The same fate awaits the plaintiffs' claims under the Ohio constitution, which provides in part:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted.

OHIO CONST., art. I, § 7. The state constitution further provides:

> Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech or the press.

OHIO CONST., art. I, § 11. As the language of the Ohio constitution suggests, it is to be read as coextensive with the first amendment of the United States' Constitution. "The Ohio Supreme Court has noted that the decisions of the United States Supreme Court can be utilized to give meaning to the guarantees found in Article I of the Ohio Constitution." *South Ridge Baptist Church v. Indust. Comm'n of Ohio,* 676 F.Supp. 799, 808 (S.D.Ohio 1987) (Graham, J.) (quoting *Heller v. Miller,* 61 Ohio St.2d 6, 399 N.E.2d 66 (1980)). Therefore, the failure of the plaintiffs' claims under the first amendment dictates that the state constitutional claims must also fail.

■ Having disposed of the plaintiffs' claims does not end the matter, however, for the defendants seek declaratory relief to the effect that "it is proper and lawful for religious activities to take place no earlier than 6:30 p.m. on school days." Defendants' Reply Memorandum at 23. The Court declines to issue such an order. In analyzing the defendants' actions under the *Lemon* test, it is clear that determination of establishment clause cases is a fact-specific inquiry which may be altered by any of a myriad of factual permutations. This case is no exception. Were it not for the behavior of Mrs. Penwell, it is not certain that the defendants could have justified their content-based decision since the danger of impermissible state endorsement would have been greatly reduced. Should the dangers presented by Mrs. Penwell's activities abate at some future date, the risk of an appearance of state endorsement may correspondingly diminish. The Club should not be prevented in perpetuity from meeting at times other than 6:30 in the absence of a showing that the interests

7. For example, in *Deeper Life,* the court noted that the danger of the appearance of state sponsorship "grows weaker when the link between the state and speech is more attenuated." 852 F.2d at 681. Thus where a religious group met well after school hours, in that case on the weekend, the danger of impermissible state endorsement was substantially diminished. *Id.*

asserted today will be unchanged tomorrow. Accordingly, the defendants' motion for declaratory relief is denied.

Finally, under the facts of this case, the Court finds that attorneys' fees are not warranted. Accordingly, the cross motions for fees are denied.

WHEREUPON, upon consideration and being duly advised, the Court finds the motion of the plaintiffs for summary judgment to be without merit, and it is, therefore, DENIED. The Court further finds that the defendants' cross motion for summary judgment with respect to the plaintiffs' claim is meritorious, and it is, therefore, GRANTED. The defendants' motion for summary judgment as to their counterclaim seeking declaratory relief is without merit, and it is, therefore, DENIED. The cross motions for attorneys' fees are without merit, and they, too, are DENIED. Accordingly, this case is dismissed in its entirety.

IT IS SO ORDERED.