**Barbara WIGG, Plaintiff,**

v.

**SIOUX FALLS SCHOOL DISTRICT 49–5; and Dr. Jack Keegan, in his individual and official capacity as Superintendent of the Sioux Falls School District, Defendants.**

**No. CIV. 03–4034.**

United States District Court,
D. South Dakota,
Southern Division.

July 2, 2003.

See also 259 F.Supp.2d 967.

Douglas E. Hoffman, Myers, Peters, Hoffman & Billion, Sioux Falls, SD, Mathew D. Staver, Joel L. Oster, Rena M. Lindevaldsen, Liberty Counsel, Longwood, FL, for Plaintiff.

Michael L. Luce, Susan Brunick Simons, Sandra K. Hoglund, Dana Van Beek Palm-

er, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The Sioux Falls School District ("the District") and Dr. Jack Keegan, the Defendants in this action, have moved for summary judgment, Doc. 34, and have also moved to strike the jury trial demanded by the Plaintiff in this action, Doc. 32. Plaintiff Barbara Wigg has responded to both motions, and in her response regarding the motion to strike the jury trial demand, the Plaintiff filed an affidavit contradicting her deposition testimony and also filed an errata sheet making the substantive changes to her deposition. The Defendants subsequently made a motion to strike the Plaintiff's errata, Doc. 48. The Court held a motion hearing and pretrial conference in this matter on June 16, 2003, and heard argument on these pending motions. For the reasons stated below, the motion for summary judgment is granted in part and denied in part; the motion to strike the jury trial demand is granted; and the motion to strike the Plaintiff's errata is granted. Additionally, the Plaintiff's Motion for a Permanent Injunction and for Declaratory Relief is granted in part and denied in part.

## BACKGROUND

The Court has previously set out the essential facts of this case in its preliminary injunction opinion in this matter. *See Wigg v. Sioux Falls School District*, 259 F.Supp.2d 967 (D.S.D.2003). For the ease of the reader, some of those facts will be repeated here. Plaintiff Barbara Wigg is a second and third grade teacher at the Laura B. Anderson Elementary School in the Sioux Falls School District. She has been employed by the Sioux Falls School District ("District") since 1988 and has been assigned to five different elementary schools during her tenure with the District. According to the affidavit of Mary Peterson, principal at Anderson Elementary, the teachers at Anderson Elementary agreed to maintain regular scheduled hours from 7:30 a.m. to 3:30 p.m. each school day, although many teachers work more than this minimum schedule. *See* Peterson Aff. at ¶ 3, Doc. 17. Plaintiff testified in her deposition that she often stays at school until 4:00 p.m. or slightly later to complete her work. *See* Wigg Depo. at 77.

The District has chosen to permit access to its buildings to various organizations in order to foster community involvement. The groups range from school-sponsored to student-initiated as well as community organizations. The Good News Club is one such group. The Good News Club requested access to the school's facilities for its meetings in October 2002. The Good News Club was granted access to School District facilities, and currently meets at five elementary schools in the District, including Anderson Elementary. The group also meets at John Kennedy Elementary, Jefferson Elementary, Harvey Dunn Elementary, and Eugene Field Elementary. The group meets at Anderson Elementary Mondays from 3:00 to 4:00 p.m. after school has dismissed at 2:45 p.m. Although the record does not explicitly indicate the meeting times at the other schools, presumably the group meets at the conclusion of the school day like at Anderson Elementary.

The Good News Club is an after-school club sponsored by Child Evangelism Fellowship. According to its literature, the purpose of the club is to "evangelize boys and girls with the Gospel of the Lord Jesus Christ and establish (disciple) them in the Word of God and in the local church for Christian living." *See* Keegan Aff., Ex.

3, Doc. 16. In order to participate in the Good News Club, each child must present a signed permission slip from a parent.

The Plaintiff desires to participate in the Good News Club meetings that transpire at District facilities. The Good News Club first meet at Anderson Elementary on December 16, 2002 in the Anderson Elementary library. There were nine students present at this first meeting, four or five of whom were in the Plaintiff's combined second and third grade class. *See* Wigg Depo. at 31–32. Each of these students presented a signed parental permission slip to participate in the group. *Id.* at 33. At this first meeting, the students learned a Bible verse, heard a Christian story and played a game. *Id.* at 37–39. After her initial participation in the Good News Club, the Plaintiff was informed by Principal Mary Peterson that she could no longer take part in Good News Club meetings held on school property because of the District's concern that her participation in the group might be perceived as an establishment of religion. Since that time, Plaintiff has not participated in any Good News Club meetings within the District.

The District has a policy entitled Religion in the Schools and at School Activities ("religion policy"). The policy prohibits school personnel from participating in religious activities on school grounds or at school-sponsored activities unless the organization has leased the facility according to the lease provision in the community access policy. The record is clear that the District interprets the lease provision to only apply in situations in which a church leases space from the District to hold church services temporarily while the church secures other accommodations. Accordingly, application of the religion policy in this instance prohibits the Plaintiff from participating in the Good News Club because it is religious in nature and meets on school property.

On January 16, 2003, the Plaintiff sent a letter to the superintendent for the District Dr. John Keegan requesting that she be allowed to participate in the Good News Club. In her letter the Plaintiff informed the District that, in order to address the Establishment Clause concerns raised by the District, the Good News Club would require each student attending the group to provide a signed permission slip that would contain the following disclaimer:

> The Good News Club is a private organization and is not affiliated with the Sioux Falls School District in any manner. If some of the participants in the Good News Club are also school district employees, then the school district employees are participating in the Good News Club on their own private time, and are not representing the school in any fashion. Nor are any school district employees "on-the-clock" while participating in the Good News Club.

*See* Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief and Damages, Ex. C, Doc. 1. The District responded to the Plaintiff's request on January 17, 2003, and stood by its earlier assessment that allowing the Plaintiff to participate in the Good News Club group at Anderson Elementary would present Establishment Clause issues for the District.

On January 28, 2003, the Plaintiff sent a second letter to the District again requesting that she be allowed to participate in Good News Club meetings. She relied upon the lease provision in the religion policy. In her letter, the Plaintiff claimed that she should be allowed to participate in Good News Club meetings if the club leased its facilities in accordance with the community use policy. The District sent a letter response on January 29, 2003, again denying the Plaintiff's request. In its letter the District explained that the provi-

sion of the policy referring to organizations which lease facilities was intended to cover circumstances in which the District permits a church to lease space in the event that the church is without its own facilities or in the process constructing its own facilities. The District claims that the language in the policy was included to allow District personnel to attend church services if her church were in such a situation of leasing facilities from the school. The District reiterated its position that if the Plaintiff participated in the Good News Club's meetings she would be violating school policy.

After repeated attempts to resolve this issue with the District failed, the Plaintiff instituted this action against the District seeking a preliminary injunction, a permanent injunction, declaratory relief, and damages. In its earlier opinion, the Court denied the Plaintiff's motion for a preliminary injunction.

## DISCUSSION

### I. Motion to Strike Jury Trial Demand

As stated above, the District has filed a motion to strike the jury trial demand made by the Plaintiff. This motion is based upon the District's assertion that the Plaintiff no longer has a viable claim for damages in this action and that her claims for equitable relief do not entitle her to a jury trial. The Court agrees.

■ In her response to the District's motion, the Plaintiff does not argue that she is entitled to a jury trial on her request for a permanent injunction or her request for a declaratory judgment. It is clear that there is no right to a trial by jury in purely equitable actions. *See Smith v. World Ins. Co.*, 38 F.3d 1456, 1462 (8th Cir.1994)("the determination of ... equitable remedies is a matter for the court to decide, not the jury."). It is equally clear that "[a]ctions for injunctions

are equitable in nature." 9 Wright & Miller, Federal Practice and Procedure: Civil 2d § 2308, p. 79 (1994). Therefore, the Plaintiff is not entitled to a jury trial on her claim for a permanent injunction.

■ With respect to declaratory judgment actions, the Court must evaluate the underlying nature of the claim to determine whether a right to a jury trial exists. The Eighth Circuit has stated:

"[a]lthough the declaratory judgment procedure largely originated in equity, declaratory relief *per se* is neither legal nor equitable. The fact that a declaratory judgment is sought neither restricts nor enlarges any right to a jury trial that would exist if the issue were to arise in a more traditional kind of action for affirmative relief. To determine whether there is a right to a jury trial in a declaratory judgment action, it is necessary first to determine the nature of the action in which the issue would have arisen absent the declaratory judgment procedure. In other words, if there would have been a right to a jury trial on the issue had it arisen in action other than one for declaratory judgment, then there is a right to a trial in the declaratory judgment action; conversely, there is no right to a trial by jury, if absent the declaratory judgment procedure, the issue would have arisen in an equitable proceeding."

*Northgate Homes, Inc. v. City of Dayton*, 126 F.3d 1095, 1099 (8th Cir.1997) (citations omitted). In the instant case, absent the declaratory judgment procedure, the Plaintiff's claim would have arisen, and did in fact arise, in an action to enjoin the District from enforcing its policy prohibiting her participation in the meetings of the Good News Club that were held on school premises. Furthermore, if the Plaintiff were to prevail in her declaratory judgment action, the effect would be to enjoin

the District from enforcing its policy, a purely equitable remedy. Accordingly, the Plaintiff's declaratory judgment action is equitable in nature in this instance, and thus the Plaintiff is not entitled to a jury trial on her request for a declaratory judgment. She does not argue otherwise.

The Plaintiff does dispute the District's contention that she has abandoned her damages claim and is thus not entitled to a jury trial on that claim. The prayer for relief in the Plaintiff's verified complaint contains a request for monetary damages for the constitutional and statutory violations that she alleges. In her deposition taken in this matter on April 28, 2003, however, the Plaintiff clearly stated on two separate occasions that she is not seeking damages in this case. Based in part upon these responses, the District filed a motion to strike the Plaintiff's jury trial demand. The Plaintiff then attempted to correct her deposition via an errata sheet by changing her answers to reflect that she was in fact seeking damages in the case and indicating that she misspoke when questioned on the matter during her deposition. The Plaintiff also filed an affidavit in which she stated that she is continuing to pursue her damages claim. The District filed a motion to strike Plaintiff's errata arguing that the Plaintiff cannot contradict her unequivocal deposition testimony via an affidavit or errata sheet. The Court will first address the District's motion to strike the Plaintiff's errata and then will go on to consider whether the Plaintiff can maintain a claim for damages.

 The Federal Rules of Civil Procedure allow deponents to make changes to their sworn deposition testimony in certain circumstance. Rule 30(e) provides in relevant part as follows:

> [i]f requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.

Fed.R.Civ.P. 30(e). The question before the Court is whether Rule 30(e) allows for the changes that the Plaintiff has attempted to make in this case. The parties agree that the Eighth Circuit has not squarely addressed the issue of whether a deponent can contradict her deposition testimony via an errata sheet. Other courts, however, have addressed the question, and the results have been mixed.

The Tenth Circuit has chosen to view Rule 30(e) corrections in the same manner that it analyzes affidavits that contradict deposition testimony. *See Burns v. Board of County Commissioners of Jackson County*, 330 F.3d 1275 (10th Cir.2003). Accordingly, the Tenth Circuit applies the test for "sham affidavits" to Rule 30(e) corrections. Under that standard, a court is to consider:

> whether the [deponent] was cross-examined during his earlier testimony, whether the [deponent] had access to the pertinent evidence at the time of his earlier testimony or whether the [Rule 30(e) correction] was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the [Rule 30(e) correction] attempts to explain.

*Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)). In adopting this standard, the Tenth Circuit quoted with approval a passage from a 1992 opinion of the Western District of Louisiana in which that court stated:

> [t]he Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at

all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination. *Id. (quoting Greenway v. International Paper Co.,* 144 F.R.D. 322, 325 (W.D.La. 1992)).

The Seventh Circuit has also had occasion to address the issue. *See Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir.2000). In *Thorn,* the Seventh Circuit recognized that, while changes in the substance of a deponent's testimony are permitted by the language of the rule itself, a change of substance which actually contradicts the deposition transcript is impermissible unless it is the correction of an error in transcription. *Id.* Like the Tenth Circuit, the Seventh Circuit reached its decision by reasoning by analogy to the line of cases that hold that a subsequent affidavit may not be used to contradict the witness's deposition testimony. *Id.*

The Second Circuit addressed substantive changes pursuant to Rule 30(e) in *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98 (2d Cir.1997). In that opinion, the court stated:

> Rule 30(e) allows deponents to make "changes in form or substance" to their testimony and to "append any changes that are made" to the filed transcript. A deponent invoking this privilege must "sign a statement reciting such changes and the reasons given ... for making them," but "the language of the Rule places no limitations on the type of changes that may be made ... nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes"—even if those reasons "are unconvincing".
>
> At the same time, when a party amends his testimony under Rule 30(e), "the original answer to the deposition questions will remain part of the record and can be read at the time of trial. Nothing in the language of Rule 30(e) requires or implies that the original answers are to be stricken when changes are made." This Court has recognized that because "any out-of-court statement by a party is an admission" a deponent's "original answer should be admitted into evidence" even when he amends his deposition testimony—with the deponent "of course ... free to introduce the amended answer and explain the reasons for the change."

*Id.* at 103 (citations omitted).

The Court finds that in this instance, the better approach is found in the opinions from the Tenth and Seventh Circuits rather than the Second Circuit. The Court agrees with the statement in *Greenway* that "a deposition is not a take home examination." *Greenway,* 144 F.R.D. at 325. If a party were allowed to create material factual disputes by altering one's deposition testimony via an errata sheet, summary judgment would rarely, if ever, be granted. Parties should not be able to evade an answer given under oath during a deposition when it is later used against them by simply stating the opposite in the errata sheet. For this reason the Court finds the analogy made to the "sham affidavit" cases to be an apt one and will apply that standard in this case.

As stated above, in determining whether an affidavit is to be disregarded, the Court should consider three questions. First the Court must determine "whether the [deponent] was cross-examined during his earlier testimony." *Franks,* 796 F.2d at 1237. Here, the Plaintiff was cross-examined by her own counsel, Rena Lindevaldsen, following her direct testimony. Although Plaintiff's counsel had just heard the Plaintiff state twice on direct examination that she was not seeking money damages in the case, counsel failed to question the Plain-

tiff on the matter. Secondly, the Court must consider "whether the [deponent] had access to the pertinent evidence at the time of [her] earlier testimony or whether the [Rule 30(e) correction] was based on newly discovered evidence." *Id.* There can be no dispute that the Plaintiff's had access to the pertinent evidence at the time that she gave her testimony. Her damages claim is not in any way based on newly discovered evidence. Finally, this Court must consider "whether the earlier testimony reflects confusion which the [Rule 30(e) correction] attempts to explain." *Id.* There is nothing in the deposition to indicate that the Plaintiff was confused or did not understand the question posed to her regarding damages. The question was straightforward and direct. The Plaintiff is an educated and intelligent person. The Court is confident that her answer that she was not seeking damages in this case was sincere. Accordingly, the Court will disregard the changes that the Plaintiff made in errata sheet, and the errata sheet will be stricken. The errata sheet and the Plaintiff's affidavit are not considered as changing or in any way altering the Plaintiff's sworn testimony.

Even if the Court were to consider the changes attempted to be made by the Plaintiff in her errata sheet, the Court would still reach the ultimate conclusion that the Plaintiff has abandoned her damages claim. The changes made to her testimony in her errata sheet along with her supporting affidavit asserting that she is still pursuing her damages claim are insufficient to create a material issue of fact as to whether the Plaintiff is seeking damages in light of her clear and unequivocal deposition testimony that she is not. In *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 289 (8th Cir.1988), the Eighth Circuit recognized the potential danger in allowing parties *carte blanche* to contradict their deposition testimony. The Eight Circuit stated:

[w]hile district courts must exercise extreme care not to take genuine issues of fact away from juries, "[a] party should not be allowed to create issues of credibility by contradicting his own earlier testimony." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365–6 (8th Cir.1983). Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions *ad hoc* with a new affidavit, and no case would ever be appropriate for summary judgment. *Id.* at 1365.

*Id.* at 289; *see also Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1568 (8th Cir.1991)(upholding district court's exclusion of affidavit that contradicted witnesses sworn deposition testimony when there was no evidence of confusion on the part of the witness at the time of the deposition and the change did not involve newly discovered evidence). At the conclusion of the Plaintiff's deposition in this case, it was clear that she had abandoned her claim for damages against the District. After the District seized on that fact and moved to strike the Plaintiff's jury trial demand, the Plaintiff then attempted to change that testimony via an errata sheet and an affidavit contending that she misspoke when question at her deposition regarding her damages claim. It is clear to the Court that to the Plaintiff this case is not about money. She made that clear in her deposition. The Plaintiff did not change her position until the consequence of the fact became known, i.e. that she was not going to receive a jury trial. Under these circumstances, the Court finds as a matter of law that no reasonable jury

could conclude that the Plaintiff is still seeking damages in this case.

■ Furthermore, even if the Court were to conclude that the Plaintiff had not abandoned her damages claim, the Court would find that the District is entitled to summary judgment on the merits of that claim. The record contains no evidence supporting the Plaintiff's claim that she was damaged other than a lone, conclusory statement in her verified complaint that she is seeking damages for "loss of reputation, embarrassment, and humiliation." The Plaintiff has offered no evidence to substantiate this allegation of damage. The Plaintiff highlights for the Court that this allegation was made in a *verified* complaint signed by the Plaintiff under oath. The Court recognizes that for purposes of summary judgment, a plaintiff's verified complaint is the equivalent of an affidavit. *See Roberson v. Hayti Police Dept.*, 241 F.3d 992, 994 (8th Cir.2001) (citation omitted). A mere allegation, however, does not become more because it is made in a verified complaint. Rule 56(e) of the Federal Rules of Civil Procedure requires a party opposing summary judgment to "set forth specific facts." The verified complaint in this case states no facts in support of the Plaintiff's claim of damages. Fed.R.Civ.P. 56(e).

The remainder to the record likewise fails to contain any evidence supporting the Plaintiff's claim for damages. The Court notes that in resistance to the Defendant's motion to strike the Plaintiff's jury trial demand, the Plaintiff filed an affidavit indicating that she is still pursuing her damages claim, but failed to articulate any facts supporting her damages claim. Therefore, the Plaintiff clearly had an opportunity to supply facts to support her damages claim but failed to do so. In this circumstance, the Court must grant summary judgment to the Defendant on the Plaintiff's claim for damages.[1]

■ Having found that the Plaintiff is not entitled to compensatory damages in this case, the Court must still consider the effect of a nominal damages award on the Plaintiff's right to a jury trial. As the Eighth Circuit has held in *Risdal v. Halford,* 209 F.3d 1071 (8th Cir.2000), an award of nominal damages is required upon proof of a violation of a party's free speech rights. Therefore, if the Plaintiff establishes that her rights have been violated, she is entitled to nominal damages in the amount of $1.00. *See id.* At the motion and pretrial conference in this matter, the Plaintiff argued to the Court that the potential for nominal damages entitles a party to a jury trial as a matter of law. The Plaintiff, however, fails to cite any authority directly on point in support of this proposition. The only authority directly on point was supplied by the Defendant and leads to the opposite conclusion.

---

1. The Plaintiff argues that she does not lose her claim for damages because she cannot compute her damages or provide documentation that verifies her damages. In this instance, the Court is granting summary judgment in favor of the Defendant's on this issue not because the Plaintiff failed to offer evidence quantifying her damages but instead because she failed to offer any facts in support of her claim. The very case cited by the Plaintiff states that it is the duty of the Plaintiff to supply the facts and the duty of the jury to compute the damages based upon those facts. *See Smith v. Pryor,* 190 S.W. 69 (Mo. App.1916). Here, the Plaintiff has failed to supply the facts supporting her claim that she suffered injury through embarrassment, humiliation, or harm to her reputation. An apparently principled stand that the Plaintiff has taken concerning her right to teach her religion after school hours on school property to young school students is not the sort of dispute that by its very existence causes injury to one's reputation through embarrassment or humiliation.

In *Van Wie v. Pataki*, 267 F.3d 109, 115, n. 4 (2d Cir.2001), the Second Circuit indicated in a footnote that in nominal damages cases, when such damages are less than twenty dollars, no right to a jury trial exists. *Id.* The Second Circuit relied upon the Seventh Amendment itself for this conclusion. The Amendment in relevant parts states as follows: "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved ..." *See* U.S. Const. amend. VII.

■ In light of the fact that *Van Wie* and the text of the Seventh Amendment constitute the only authority before the Court on this issue, and that the Court's own research has uncovered no other authority, the Court will rely on the Seventh Amendment's text just as the Second Circuit did in *Van Wie*. Therefore, the Plaintiff is not entitled to a jury trial in this matter because if she prevails, her nominal damages award will be $1.00, which does not exceed the twenty dollar threshold required by the Seventh Amendment. Accordingly, the Defendant's motion to strike the Plaintiff's jury trial demand will be granted.

## II. Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir. 1988). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, in cases such as this where the issues are primarily legal rather than factual, summary judgment is particularly appropriate. *See Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir.1990).

### A. Sovereign Immunity

■ The first argument that the District advances in support of summary judgment is that it is entitled to immunity in this case. The District argues that 1) it is not a "person" within the meaning of 42 U.S.C. § 1983, and 2) it is protected by sovereign immunity under the Eleventh Amendment. The Plaintiff disputes both contentions arguing that the District is not an arm of the State and thus is a "person"

within the meaning of § 1983 and is not entitled to Eleventh Amendment immunity.

The United States Supreme Court has recognized that the reach of Eleventh Amendment immunity and the scope of § 1983 present different issues but a review of the Court's rulings demonstrates that the Court has found parity in these areas. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66–67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Court has held states and governmental entities that are considered "arms of the state" are entitled to Eleventh Amendment immunity and not considered "persons" for purposes of § 1983. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Will,* 491 U.S. at 70, 109 S.Ct. 2304. It is equally clear under the law that the protection of the Eleventh Amendment does not extend to counties and similar municipal corporations. *See Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (citations omitted). Furthermore, the United States Supreme Court has held that a municipality is a "person" within the meaning of § 1983. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, the issue this Court must decide is whether the District is an "arm of the state" entitled to Eleventh Amendment immunity and not a "person" for § 1983 purposes or whether it is more akin to a municipal corporation without Eleventh Amendment immunity and is a "person" within the context of § 1983.

The answer to this question "depends, at least in part, upon the nature of the entity created by state law." *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568. The District argues that under South Dakota law, school districts are considered arms of the state, and the Plaintiff maintains that South Dakota's school districts are local political subdivisions akin to municipal corporations. After a review of the relevant state law, the Court agrees with the Plaintiff that South Dakota' school districts are not arms of the states for purposes of Eleventh Amendment immunity.

In *Mt. Healthy,* the Supreme Court found that an Ohio school district was not entitled to Eleventh Amendment immunity because, under Ohio law, school districts were treated like local municipalities and counties rather than arms of the state. *Id.* at 280, 97 S.Ct. 568. In reaching this conclusion, the Court recognized that Ohio law defined "State" as not inclusive of "political subdivisions" while at the same time defining "political subdivisions" to include local school districts. *Id.* The Court further stated that although Ohio school districts received some guidance from the State Board of Education and also received a significant amount of funding from the State, the local school boards had extensive power to issue bonds and levy taxes. *Id.* Based upon this evidence, the Court found that the school board was more like a county or city than arm of the state. *Id.* The State of South Dakota characterizes its school districts in much the same way as the State of Ohio.

South Dakota Codified Law 1–24–1(3) defines "State" as "a state of the United States and the District of Columbia." Subparagraph (4) of that same statute defines "state agency" as follows:

(4) "State agency," each association, authority, board, commission, committee, council, department, division, office, officer, task force or other agent of the state vested with the authority to exercise any portion of the state's sovereignty; provided that the term shall not include the legislative or judicial branch of the government of the state or units of local government, including but not limited to counties, townships, munici-

palities, chartered governmental units, or school or other special districts, or Indian tribes.

Therefore, like in *Mt. Healthy*, South Dakota's school districts are not included in the State's definition of the term "State." Furthermore, S.D.C.L. 1–24–1(4) explicitly states that school districts are local units of governments. South Dakota law lumps school districts in the same category as municipalities and counties.

South Dakota law defines school districts as "[a]ny territory organized for the express purpose of operating not less than a thirteen-year school program and governed by an elected school board." S.D.C.L. § 13–5–1. South Dakota's school districts can "sue and be sued, contract and be contracted with, purchase, hold and use personal and real property for school purposes, and sell and dispose of the same." *Id.* Additionally, under the South Dakota Constitution, the legislature is empowered to authorize school districts to levy taxes. *See* SD. Const. Art. 8, § 15. Pursuant to S.D.C.L. § 13–3–1.4, the secretary of the Department of Education and Cultural Affairs has general supervisory power over South Dakota's schools. Like in *Mt. Healthy*, on the balance of this record, the Court finds that school districts within the state of South Dakota are akin to municipalities and accordingly are not entitled to Eleventh Amendment immunity and do qualify as "persons" amenable to suit under 42 U.S.C. § 1983.

This finding is strengthened by the fact that if there were to be a damages award against a school district, the award would be paid the school district and not the state. The Eighth Circuit has held that "[i]n determining whether a state agency or department shares the state's Eleventh Amendment shield, the key is who will pay for any judgment rendered in favor of [the plaintiff]." *See Miener v. State of Missouri*, 673 F.2d 969, 980 (8th Cir.1982).

Although there is no longer a damages claim in this case, the fact that such an award would not be paid out of the state's coffers lends credence to the conclusion that the District is not an arm of the state.

In asserting that it is entitled to immunity in this case, the District relies upon *Bego v. Gordon*, 407 N.W.2d 801, 805 (S.D. 1987). In *Bego*, the South Dakota Supreme Court found that under South Dakota law, "school districts, as state agencies, enjoy sovereign immunity from tort liability absent an express consent from the legislature." *Id.* (citations omitted). The *Bego* court quoted a much earlier opinion of the South Dakota Supreme Court in which the court stated that "[s]chool districts are state agencies exercising and wielding a distributive portion of the sovereign power of the state, and the officers of school districts are the living agencies through whom the sovereign state act is carried into effect." *Id.* (quoting *Plumbing Supply Co. v. Board of Education, Etc.*, 32 S.D. 270, 272–273, 142 N.W. 1131, 1132 (1913)). In *Plumbing*, however, the South Dakota Supreme Court also stated that "[c]ounties, civil townships, and school districts are classified as quasi-municipal corporations." *Plumbing Supply Co.*, 142 N.W. at 1132. Therefore, although school districts may be entitled to immunity in the state courts of South Dakota, it is equally clear that South Dakota law treats school districts "as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *See Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568.

The District contends that to make a distinction between sovereign immunity in state court and Eleventh Amendment immunity in federal court is to misunderstand the scope of immunity recognized by the Eleventh Amendment. The Court disagrees. In support of its position, the

District relies on a trilogy of recent United States Supreme Court opinions including *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), for the proposition that the Eleventh Amendment does not limit the State's sovereign immunity, but, instead, the states retain a residuary and inviolable sovereignty that bars federal jurisdiction over suits against nonconsenting states. The District quotes the following passage from *Alden:*

> The phrase [Eleventh Amendment immunity] is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment. Rather, as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

*Alden*, 527 U.S. at 713, 119 S.Ct. 2240.

Although the Court does not take issue with the District's assertion that sovereign immunity is a fundamental aspect of state sovereignty retained by the States, such a finding does not answer the question before the Court. *Alden* did not address what entities are to be characterized as arms of the state and cloaked with sovereign immunity. The defendant in *Alden* was the State of Maine itself. At issue in *Alden* was whether Congress had power under Article I of the United States Constitution to subject nonconsenting states for private suits for damages in state courts. *See Alden*, 527 U.S. at 730, 119 S.Ct. 2240. There is no indication in *Alden* that the Court intended to overrule

the holding of *Edelman v. Jordan*, 415 U.S. at 667, 94 S.Ct. 1347, that such immunity does not extend counties and municipalities. Therefore, the Court's above conclusion that the school district is not an arm of the state but rather akin to a municipality is not disturbed by *Alden.*

Given that the District is not immune from suit, the Court must determine whether questions of fact remain in this litigation that preclude the entry of summary judgment. The Court finds that no material questions of fact persist and that summary judgment is thus appropriate.

## B. Free Speech Claim

The Plaintiff alleges that the District engages in viewpoint regulation of her speech when it prohibits her from participating in the Good News Club based upon the religious viewpoint of the club's message. She argues that since she is allowed to participate in secular clubs that teach morals and character to students from a secular perspective but is prohibited from participating in the Good News Club that teaches moral and character to students from a religious perspective, the District's regulation of her speech is viewpoint-based.

The District contends that the Plaintiff misinterprets viewpoint discrimination and that its regulation of her speech is content-based rather than viewpoint-based. The District relies on *Campbell v. St. Tammany's Sch. Bd.*, 206 F.3d 482, 487 (5th Cir. 2000) *rev'd*, 533 U.S. 913, 121 S.Ct. 2518, 150 L.Ed.2d 691 (2001), in which the Fifth Circuit found that any ban on religious activities does not necessarily equal viewpoint discrimination. The court stated: "[r]eligion may be either a perspective on a topic such as marriage or may be a substantive activity in itself. In the latter case, the government's exclusion of the activity is discrimination based on content,

not viewpoint." *Id.* The District contends that the activities of the Good News Club fall into to the latter category.

The District's position is supported by the promotional literature of the Good News Club. The brochures of the organization provide as follows:

What are after-school Good News Clubs?

After-school Good News Clubs are Bible classes children may attend one a week after school hours. They are an excellent opportunity for children in the public schools to hear the Gospel and learn the truth from God's Word.

Good News Clubs usually meet during the school year for an hour each week reaching children who might not attend church or hear the Gospel. It is also an effective discipleship program helping the local church to extend their outreach to children in the community. These clubs are supervised by CEF staff and taught by Christian teens or adults who receive specialized training. CEF Press teaching material is used, including visualized Bible lesson, missionary emphasis, memory verses, songs and review and learning activities. *As with all CEF ministries, the purpose is to evangelize (disciple) them in the Word of God and in a local church for Christian living.*

*See* Keegan Aff. at Ex. 3 & 4 (emphasis added). In the Clubs literature, the only mention of character and morals appears as follows:

As will all CEF ministries, the purpose of after-school Good News Clubs is to evangelize boys and girls with the Gospel of the Lord Jesus Christ and establish (disciple) them in the Word of God in a local church for Christian living. To accomplish this goal, each club includes a clear presentation of the Gospel and on opportunity for children to trust Jesus as Savior. Each club also includes strong discipleship teaching to

build character and strengthen moral and spiritual growth. All clubbers are encouraged to attend a local church.

*See id.* at Ex. 3.

The Court agrees with the District in that the explicit purpose of the Good News Club and the Plaintiff's participation therein is to evangelize public school students and that the teaching of morals and character is only an incidental by-product of that stated goal. Therefore, the Court is persuaded that, in using the distinction drawn by the Fifth Circuit in *Campbell* between religion as a substantive activity and religion as a viewpoint on a particular topic, the Good News Club's activities are more properly characterized as substantive religion and not the teaching of morals and character from a religious perspective. The Court is, however, constrained by the United States Supreme Court's precedent in *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) and accordingly must reach the opposite conclusion.

In *Milford* the Court concluded exclusion of the Good News Club from the school constituted viewpoint-based discrimination of speech. *See id.* at 109, 121 S.Ct. 2093. The Court disagreed with the Second Circuit Court of Appeals, which found no viewpoint discrimination, and stated: "[w]e disagree that something that is 'quintessentially religious' or 'decidedly religious' in nature cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint." *Id.* at 111, 121 S.Ct. 2093. (citation omitted). The Court also concluded that the activities of the Good News Club "do not constitute mere religious worship, divorced from any teaching of moral values." *Id.* at 112, n. 4, 121 S.Ct. 2093.

This Court recognizes that the Fifth Circuit's *Campbell* opinion relied on by the

District was vacated by the United States Supreme Court and remanded to the Fifth Circuit for further consideration in light of the *Milford* decision. *See Campbell v. St. Tammany's School Board*, 533 U.S. 913, 121 S.Ct. 2518, 150 L.Ed.2d 691 (2001). The Fifth Circuit then chose to remand the case back to the District Court for the Eastern District of Louisiana for further consideration. *See Campbell v. St. Tammany's School Board*, 300 F.3d 526 (5th Cir.2002). As of the date of this opinion, the case is still pending before the District Court.

The District argues to this Court that *Campbell's* analysis of viewpoint discrimination was not impacted by *Milford* and is still good law to be considered. Given the above-quoted passages from *Milford* regarding viewpoint discrimination and the nature of the Good News Club, this Court cannot agree. Furthermore, given that the Fifth Circuit's judgment was vacated and that no substantive decision has been entered in the case since the Supreme Court vacated the judgment, the Court finds the precedential value of *Campbell* suspect at best.

▇▇▇ Therefore, in light of the *Milford* decision, the Court finds that the District in this instance is engaging in viewpoint discrimination in not allowing the Plaintiff to participate in the Good News Club. Thus, this case squarely presents the issue left open by the Supreme Court in *Milford:* whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination of speech. *See Milford*, 533 U.S. at 113, 121 S.Ct. 2093. Given that this is an open question in the law, neither party has provided much guidance to the Court in making this decision. *Good News/Good Sports Club v. Sch. Dist. of the City of Ladue*, 28 F.3d 1501 (8th Cir.1994) suggests the answer is yes but found no Establishment Clause defense. Plaintiff at footnote 6 in her Opposition to Summary Judgment says that the Eighth Circuit was wrong in that suggestion. This Court finds that, in this instance, the answer must be yes.

▇▇▇ Setting priorities between the various clauses of the First Amendment is a difficult an unenviable task. The Court is placed in the position of choosing whether to give precedence to the Free Speech Clause or the Establishment Clause in a case in which both interests are valid and substantial. In this case, scales are tipped by the fact that the Plaintiff is an employee of the District and thus does not have free speech rights co-extensive to that of the private person. Although it is true that teachers and students do not shed their constitutional rights at the schoolhouse gate, these rights are not absolute. *See Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). In the public school context, the free speech rights of the speaker may be curtailed if they interfere with the rights of others. *See Tinker*, 393 U.S. at 513, 89 S.Ct. 733.

In addition to the valid limitations that may be placed upon speech of public employees, the Court also recognizes deference need be paid to schools when they are thrust into resolving tensions between the different clauses of the First Amendment. In *Marchi v. Board of Co–op. Educational Servs. of Albany*, 173 F.3d 469, 476 (2d Cir., 1999), the Second Circuit wrote:

> when government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably by determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well

be protected by the Free Exercise Clause if the individual were not acting as an agent of government.

*Id.* The court went on to state:

The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though school boards, like all instrumentalities of government, must observe the basic free exercise rights of its employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the government employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

*Id.* Although the *Marchi* court spoke in terms of the Free Exercise Clause, the governmental employer faces the same tensions when dealing with the Free

Speech Clause in cases in which the speech at issue that could potentially be attributed to the government is of a religious nature as is the case here. Furthermore, the Supreme Court in *Tinker,* 393 U.S. at 507, 89 S.Ct. 733 stated that "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* (citing *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), *Meyer v. Nebraska,* 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). Therefore, in the fact-specific circumstances presented in this case, the Court concludes that if the District can establish a valid Establishment Clause concern, its *viewpoint-based regulation of* the Plaintiff's speech will be upheld. If no valid Establishment Clause interest is found, the District cannot continue to prevent the Plaintiff's speech.

Because of the Establishment Clause, religious speech in some instances is not the same as other speech. In the majority opinion in *Lee v. Weisman,* 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), Justice Kennedy stated:

[t]he First Amendment protects speech and religion by quite different mechanisms. Speech is protected by insuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as its own .... In religious debate or expression the government is not a prime participant, for the Framers deemed religious establishment antithetical to the freedom of all.... [T]he Establishment Clause is a *specific prohibition* on forms of state intervention in religious affairs *with no precise counterpart in the speech provisions.* The explanation lies in the lesson of history

that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.

*Id. (emphasis added).*

The public forum doctrine does not apply as the school is not a public forum despite the fact that various organizations are allowed to use the school building for meetings of those organizations. A non-public forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n. v. Perry Local Educators Ass'n.,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

In applying Establishment Clause jurisprudence in this case, the Court must be mindful of the posture of the case. Here the Plaintiff has advanced a free speech claim and the District has proffered the Establishment Clause as a defense to her claim. Therefore, in such a context, the Court must determine whether the District would be forced to violate the Establishment Clause if it were compelled to allow the Plaintiff to participate in the Good News Club.

Absent any Establishment Clause defense, the Plaintiff's free speech claim would prevail, and the religion policy as applied to her to prevent her from participating in religious clubs that meet in District facilities would be unconstitutional. It is at this point in the analysis that the Court must apply the *Lemon* test, i.e., the state of affairs if the District were not allowed to enforce its religion policy to prevent the Plaintiff from participating in religious clubs. At this stage of the analysis, the Plaintiff would be allowed to participate in any group that meets in District facilities pursuant to the community access policy without regard to the content of the group. In such a situation, the District would not be affirmatively allowing the Plaintiff to participate in religious clubs, but rather allowing her to participate in groups of her choosing without regard to the nature of the group.

The three-prong *Lemon* test, although difficult to apply in some instances and the subject of much criticism, endures as the primary test for Establishment Clause analysis. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 398–399, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)(SCALIA, J. concurring in judgment)(collecting opinions criticizing *Lemon*); *Wallace v. Jaffree,* 472 U.S. 38, 108–114, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)(REHNQUIST, J. dissenting)(stating that *Lemon's* "three part test represents a determined effort to craft a workable rule from a historically faulty doctrine; but the rule can only be as sound as the doctrine it attempts to service."). *"Lemon,* however frightening it may be to some, has not been overruled." *Lamb's Chapel,* 508 U.S. at 395, n. 7, 113 S.Ct. 2141 (quoted in *Stark v. Independent Sch. Dist.,* 123 F.3d 1068, 1073 (8th Cir.1997)).

Under the *Lemon* analysis, this Court is to determine (1) whether the action at issue has a legitimate secular purpose; (2) whether it has a primary effect of advancing or inhibiting religion; and (3) whether it fosters an excessive entanglement between the government and religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Although application of the *Lemon* test is not always easy and straightforward, it is clear in the law that what the Establishment Clause mandates is government neutrality concerning religion. *See Epperson,* 393 U.S. at 103–104, 89 S.Ct. 266. It

seems that the reasonable observer test has to some extent swallowed the *Lemon* test.

The District's purpose in allowing the Plaintiff to participate in the Good News Club under these circumstances would have a legitimate secular purpose as required by *Lemon's* first prong. Although the Good News Club itself has the avowed religious purpose to proselytize their particular views of Christianity to children and have the children accept those views, the District's purpose would be only to allow its teachers to participate in all groups that meet in District facilities in a neutral manner by not discriminating against religious groups. As the Supreme Court found in *Milford,* the District must allow access to religious groups pursuant to its access policy in order to comport with the neutrality requirement. Allowing all school personnel to participate in religious as well as other clubs in school buildings is a next step in testing the limits of that neutrality principal. The District's purpose in allowing religious clubs access to school buildings is a non-religious purpose as the District is required by *Milford* to do so since other groups are also allowed access. As a general proposition, allowing all school personnel to participate in those various clubs, including religious clubs, using school buildings after hours, has a legitimate secular purpose of neutral community involvement by the District.

*Milford* holds that the government must be neutral toward religion and allow religious groups such as the Good News Club to meet on school premises after school hours if other community groups are also allowed to meet on the school premises. The District has complied with *Milford* and the Good News Club is allowed to meet after hours in school buildings. As a result, this case is not about access as this case prominently presents a critical difference from *Milford.* The Plaintiff is a teacher in the school system. Given that the reasonable observer test is applicable to both the second and third prongs of the *Lemon* test, this fact that the Plaintiff is a school teacher is highly relevant to these considerations.

In evaluating whether a particular action violates the second prong of *Lemon,* the Court must determine whether a reasonable observer of the action would perceive it to endorse religion. *See County of Allegheny v. ACLU,* 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1979); *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1543 (6th Cir.1992)(en banc). These inquires are fact specific, so what is true for a teacher in her own school right after classes let out may be different than if a school secretary or custodian or an administrator officed either in or out of the school building was the one who was going to teach the Good News class. Due to their relationship with students, particularly young students, teachers are in a special position to shape the views of young students. *Good News Club v. Milford Central School,* 533 U.S. 98, 117, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)( "[o]bviously when individuals who are not schoolteachers are giving lessons after school to children permitted to attend only with parental consent, the concerns expressed in *Edwards* are not present."); *see also Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Bell v. Little Axe Independent Sch. Dist.,* 766 F.2d 1391, 1404 (10th Cir. 1985) ("Elementary schoolchildren are vastly more impressionable than high school or university students"); *Quappe v. Endry,* 772 F.Supp. 1004 (S.D.Ohio 1991); *Culbertson v. Oakridge Sch. Dist.,* 258 F.3d 1061, 1065 (9th Cir.2001)(finding that requiring schoolteachers to distribute permission slips in class for children to attend religious group violated the Establishment

Clause because it gave the impression that the school endorsed the religious activity); *Rusk v. Crestview Local Schools,* 220 F.Supp.2d 854, 859 (N.D.Ohio 2002)(finding that because of the danger that young children will be unable to differentiate between neutrality towards and endorsement of religion, the distribution of flyers announcing religious community events violated the Establishment Clause). It is this special position held by teachers that would lead a reasonable observer to conclude that the school endorses religion by allowing one of its teachers to participate in a religious club that meets directly after the school day in the very building in which that teacher holds her own classes. Thus, with respect to Anderson Elementary, the Plaintiff's involvement with the group has the primary effect of advancing religion by giving the impression that the District endorses religion. The District need not actually endorse religion for an Establishment Clause violation. "Appearing" to endorse religion is enough for an Establishment Clause violation. *See Allegheny County,* 492 U.S. at 574, 109 S.Ct. 3086 ("The [Establishment] Clause, at the very least, prohibits government from *appearing* to take a position on questions of religious belief. . . .")(emphasis added); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985)(stating the issue as whether "the challenged governmental action is sufficiently likely to be *perceived* by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval of their individual religious choices").

Finally, when the school's own teacher goes from teaching in her class in her school to teaching the students in her same school, it is as if school never ended. It would appear to a reasonable adult observer that a child would view this as just another class at the end of the school day taught by a teacher that was there all day.

A reasonable observer would consider this excessive government entanglement with religion.

The *Lemon* analysis yields a different result where the teacher travels to another school to teach the Good News message and where she wears a visitor's badge and not a teacher's badge. It is presumed that the spirit of changing badges and identities would not be violated by the teacher so she would not tell the students that despite her visitor's badge she was a teacher in the school system. Likewise, the District cannot fortify its Establishment Clause defense by refusing to allow a teacher to wear a visitor's badge when she teaches the Good News message in another school.

Even with the teacher now in another school, there still is a secular legislative purpose, i.e. neutrality, to satisfy the first prong of the *Lemon* test. The final prong is close, as there is still government entanglement with religion, but it is less than where the District's teacher is in her own school. Now she is in another school as a visitor, she is not identified to the students as a teacher in the school system and there would have been some break in time when she traveled from her school to the school where she will teach the Good News message. To a reasonable and well informed observer this would not be excessive government entanglement with religion.

Under the second prong of *Lemon,* if the Plaintiff were in another school, the principal or primary effect of the District's policy in allowing her to be there would not be to advance religion but rather a recognition of the private rights many public employees, including teachers, have when they truly step out of their role as public school teachers. In a different school within the District, the teacher is just another volunteer participating after work in a religious club. She is not identified as a member of the District's person-

nel, and more importantly, she is not perceived as a schoolteacher by a reasonable observer. Furthermore, the activity is not an extension of her school day because she has traveled to a different location to teach and none of her students would be present at the new school. The District has pointed out that there are some transfers from school to school within the District, but that movement is not significant enough to change this analysis. A well informed reasonable observer would not perceive the Plaintiff's involvement as the District's endorsement of religion, and thus the second prong of *Lemon* is not violated.

The third prong of *Lemon* also is not violated when the Plaintiff participates in a religious club at a school other than Anderson Elementary. A well informed reasonable observer would not believe that in this second factual setting described above there would be excessive government entanglement with religion. Of course, the well informed observer would be aware, among other things, of the fact that in 2001 the United States Supreme Court held in *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) that a school district could not exclude the Good New Club itself from meeting after school hours at school just like any other community club.

As the above analysis demonstrates, the District prevails on its Establish Clause argument with respect to the Plaintiff participating in the Good News Club at Anderson Elementary but does not prevail with respect to her doing so at other schools within the District. Therefore, the district has established a compelling governmental interest, that being avoidance of an Establishment Clause violation, that justifies its viewpoint-based regulation of the Plaintiff's speech at Anderson Elementary. Accordingly, the District can continue to prevent the Plaintiff from taking part in the Good News Club at Anderson Ele-

mentary and will be awarded summary judgment on that claim.

With respect to the other schools in the District, however, the District has not provided a compelling governmental interest because there is no potential Establishment Clause violation in that context. Thus, the Plaintiff prevails on the merits of her free speech claim with respect to the other schools. Accordingly, the Court must consider the other factors applicable in determining whether the Plaintiff is entitled to a permanent injunction preventing the District from applying its religion policy to prevent her from participating at the Good News Club at other schools within the District.

■ "The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999)(citing *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Therefore, the Court is to consider the threat of irreparable harm to the movant, the balance between this harm and the harm to the other party if the injunction is granted, the public interest, and the merits of the case. *See Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). As stated above, the Plaintiff prevails on the merits of her free speech claim with respect to attending the Good News Club meetings at other school within the District. As a result, the *Dataphase* analysis deals only with the Plaintiff attending the Good News Club meetings at other schools within the District.

■ Considering the threat of irreparable harm to the movant, the Court finds that the Plaintiff would suffer abridgment of her free speech rights and irreparable

injury if she cannot participate in the Good News Club. The Supreme Court has repeatedly held that "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). This harm is tempered by the fact that other options are available to the Plaintiff to engage in her speech. First, the District offered to comply with *Quappe v. Endry,* 772 F.Supp. 1004 (S.D.Ohio 1991) by allowing the Plaintiff to participate in the Good News Club meetings if the meeting time was moved from directly after school to early evening. The Plaintiff declined that offer. Second, Kelly Peterson, a woman who lives only six blocks from Anderson Elementary, offered to open her home to the Plaintiff for the purpose of holding the Good News Club meetings, but the Plaintiff declined that offer as well. *Id.* at 94–95. Given the staunch protection for free speech rights in our society, the Court finds that this factor weighs in favor of the Plaintiff as there is no counter Establishment Clause defense for the District.

In balancing the harms in this case, the Court finds that the balance clearly weighs in favor of the Plaintiff with respect to participating in Good News Club meetings in the other schools. In this instance, the District does not have a valid Establishment Clause interest. Consequently, the harm to the District is minimal in this situation. The Plaintiff, however, does have a valid free speech interest and is harmed if she is not allowed to exercise that right as stated above.

The Court finds that the third factor, the public interest, also weighs in favor of the Plaintiff. Allowing the Plaintiff to participate in Good News Club meetings that occur at schools other than the school in which the Plaintiff teaches adequately protects the concerns underlying the Establishment Clause while at the same time providing appropriate respect for the Free Speech Clause. The public is best served when the protection of free speech rights is properly balanced against the Establishment Clause. Therefore, the Court finds that the Plaintiff is entitled to a permanent injunction preventing the District from applying the religion policy to prevent her from participating in Good News Club meetings that take place at schools other than Anderson Elementary.

For the final factor, the merits of the case, the Court finds that the Plaintiff does have a valid free speech claim which is not overcome by the Establishment Clause concern of the District when the Plaintiff is in a school other than her own.

Looking at another aspect of this dispute, where the Plaintiff is a teacher teaching the Good News message in her own school to students of that school just after the last regular class, she is still a state actor. She ceases to be a state actor when after school is over she travels to another school and as a visitor teaches children not from her school. The teacher's situation can be analogized to that of some person in libel law. The teacher while teaching students in her own school is akin to a limited purpose public figure. When the teacher travels after school to another school to teach other students as a visitor she has more of the indicia of a private person and is no longer that limited purpose public figure, but is instead now a private person and also not a state actor. This Court does not believe that whether or not the teacher is a state actor is an issue necessary to determining this dispute as the real issue in this case is whether the two factual situations presented, teaching religion in her own school and in other schools, violates the Establish-

**1106**

ment Clause. Whether or not the teacher is a state actor in either instance is not determinative or even involved in the Establishment Clause analysis. The question is whether the District is incorrect in relying upon the Establishment Clause to prevent Plaintiff's religious teaching in both the school at which she teaches as well as other schools. The Court makes these observations for the appeal that may follow.

### C. Free Exercise Claim

■ The Plaintiff contends that the District's policy and actions in prohibiting the Plaintiff from participating in the Good News Club after school hours violate the Plaintiff's right to free exercise of religion under the First Amendment. The Court disagrees.

To establish that her free exercise rights have been violated, the Plaintiff "must first show 'that the government action complained of substantially burdened [her] religious activities.'" *Altman v. Minnesota Department of Corrections,* 251 F.3d 1199, 1204 (8th Cir.2001)(quoting *Brown v. Polk County,* 61 F.3d 650, 658 (8th Cir.1995)(en banc)). "Government significantly burdens the exercise of religion if it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith, or denies reasonable opportunities to engage in fundamental religious activities." *Id.* (citation omitted). The Court finds as a matter of law that, under the facts of this case, the Plaintiff cannot demonstrate a substantial burden on her religious activities.

The Plaintiff claims to have "a religious belief to teach morals and character to young children from a religious perspective during her private time, after school hours." *See* Verified Complaint, Doc. 1, ¶ 11. Absent teaching the Good News

Club in District facilities, the Plaintiff has at least two other opportunities to teach religion to children. First, the church of which she is a member, Abiding Savior Lutheran, has an after-school program for the ministry of children in which the Plaintiff could take part. *See* Wigg, Depo. at 67–68, Doc. 44, Ex A. Second, as stated above, Ms. Peterson offered to open her home to the Plaintiff for the purpose of holding the Good News Club meetings, but the Plaintiff declined that offer. *Id.* at 94–95. Under these circumstances, denying the Plaintiff the opportunity to participate in the Good News Club in District facilities does not curtail her ability to exercise her faith in any meaningful way. She can still take part in activities that advance the very beliefs she espouses.

The Plaintiff also claims to have "a religious belief to participate in the Good News Club meetings that meet on School District facilities during her private time, after school hours." *See* Verified Complaint, Doc. 1, ¶ 12. There is no evidence in the record to support that the location of the meetings is central, or even relevant, to the Plaintiff's religious beliefs. The Plaintiff has offered no evidence or argument before this Court pointing to any substantial burden upon her religious activities stemming from the District denying her the opportunity to participate in Goods News Club meetings only when they take place on District property, and the Court sees none. She can fully participate and advance her religious beliefs by taking advantage of the other opportunities discussed above. Therefore, the Plaintiff's free exercise claim must fail.

### D. Freedom of Association Claim

■ In Count II of her Verified Complaint, the Plaintiff claims that the District has violated her right to peaceably assemble under the First Amendment. In all

the briefing that has been presented to this Court throughout this case, neither party has addressed this claim. The Court finds that the Plaintiff does not prevail on this claim.

As the Eighth Circuit has recognized, "there is no doubt that 'the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by te First and Fourteenth Amendments.'" *Hanten v. Sch. Dist. of Riverview Gardens,* 183 F.3d 799, 805 (8th Cir.1999)(quoting *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 233, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)). It is also clear, however, that not every governmental action that might conceivably impose upon a citizen's freedom of association is actionable. *Id.* In *Lyng v. International Union, United Automobile Aerospace and Agricultural Implement Workers of America, UAW,* 485 U.S. 360, 366, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Court applied rational basis review to a governmental action that did not "directly and substantially interfere" with the right to freely associate. *Id.* at 366, 108 S.Ct. 1184. The Court finds that the same rational basis review must apply in this instance.

The District's policy prohibiting the Plaintiff from taking part in religious activities that occur on District property does not "directly or substantially interfere" with the Plaintiff's freedom to associate. The policy does not prevent the Plaintiff from associating with religious groups, only from doing so in District facilities. As the record demonstrates, the Plaintiff has ample opportunities to associate with religious groups at places other than District facilities. The Plaintiff has such associational opportunities at her church. In fact, she engage in religious association by teaching Sunday school at her church. Furthermore, as stated above, the Plaintiff could conduct Good News Club meetings at a private home only a few blocks from her school. Under these circumstance, it is "exceedingly unlikely" that the District's policy will prevent the Plaintiff from continuing to associate with religious groups. *See Lyng,* 485 U.S. at 366, 108 S.Ct. 1184.

In applying the rational basis test, the Court finds that the District's policy is supported by the legitimate governmental interest in avoiding Establishment Clause violations. Preventing employees from engaging in religious activities that occur on District property advances this interest. As indicated earlier in this opinion, the Establishment Clause is violated if the Plaintiff takes part in the Good News Club that meets in the same school in which she teaches directly after the school day. Accordingly, the District can satisfy the rational basis test, and the Plaintiff's freedom of association claim cannot prevail.

**E. Establishment Claim**

In Count IV of her Verified Complaint, the Plaintiff argues that the District's actions and policies violate the Establishment Clause in that they do not have a secular purpose, are hostile toward religion, and create an excessive government entanglement with religion. This claim, like the freedom of association claim has not been addressed by the parties. The Court finds that the Plaintiff does not prevail on this claim.

As stated above, the Court must apply the *Lemon* test in evaluating the Plaintiff's Establishment Clause claim. In this context, however, the Court must apply the Establishment Clause analysis from the Plaintiff's perspective. The Court finds that the District's polices and actions in this case have a secular purpose in that the District is attempting to comply with the mandates of the Constitution. The District allows access to groups on equal footing regardless of the nature of the group in accordance with the dictates of the Free

Speech Clause, and it has special rules regarding involvement of it personnel in religious clubs that take place on its premises or at school-sponsored activities in an effort to comply with the mandates of the Establishment Clause. Although it is true that the Court concluded earlier in this opinion that the District does not have a valid Establishment Clause defense to the Plaintiff attending religious clubs that meet at schools other than the school at which she teaches, this does not mean that the schools *purpose* is not secular in nature. The Court finds that the District's intent is to walk the fine line between the Establishment Clause and the Free Speech Clause. This is a secular purpose.

The Court finds that the District's actions and policies do not have the principal or primary effect of inhibiting religion. A well-informed reasonable observer would not view the District's actions as hostile to religion. The District has allowed access to its facilities to religious groups. A reasonable observer would conclude that, in curtailing the religious expression of its employees while on school property, the District is only trying to prevent the perception that it endorses religion, not that the District disfavors religion.

Finally, the Court does not believe that the District's policies and actions create an excessive entanglement between religion and the District. In fact, that is what the District is trying to avoid. In allowing religious groups access but denying participation in such groups to its personnel, the District is attempting to limit the connections between itself and the religious group.

In ruling on the Plaintiff's Establishment Clause claim, the Court is mindful of the deference that must be given to school districts in this delicate area, and especially so when dealing with school district employees. *See e.g. Marchi,* 173 F.3d at 476.

IT IS ORDERED:

(1) that Defendants' Motion to Strike Jury Trial Demand, Doc. 32, is granted;

(2) that Defendants' Motion to Strike Plaintiff's Errata, Doc. 48, is granted;

(3) that Defendants' Motion for Summary Judgment, Doc. 34, is granted in part and denied in part as follows:

(a) granted as to Count I of Plaintiff's Verified Complaint alleging a violation of the Plaintiff's right to freedom of speech with respect to the Plaintiff's participation in religious clubs that meet at the school at which she teaches and denied with respect to Sioux Falls School District's facilities other than the School at which the Plaintiff teaches;

(b) granted as to Count II of Plaintiff's Verified Complaint alleging a violation of the Plaintiff's right to peaceably assemble;

(c) granted as to Count III of Plaintiff's Verified Complaint alleging a violation of Plaintiff's right to freedom to exercise her religion;

(d) granted as to Count IV of Plaintiff's Verified Complaint alleging a violation of the Establishment Clause; and

(e) granted as to Plaintiff's claim for damages on all counts

(4) that Plaintiff's Motion for a Permanent Injunction and Declaratory Relief. Doc. 2, is granted in part and denied in part as follows:

(a) denied as to allowing Plaintiff to participate in the Good News Club meetings that meet at the school at which the Plaintiff teaches;

(b) granted as to allowing Plaintiff to participate in religious clubs that meet

in Sioux Falls School District facilities other than the school at which the Plaintiff teaches;

(5) that the Defendants are permanently enjoined from prohibiting the Plaintiff from participating in religious clubs that meet in Sioux Falls School District facilities other than the school at which the Plaintiff teaches; and

(6) that the Defendants' Religion in Schools and at School Activities Policy is unconstitutional as applied to the Plaintiff to prevent her from participating in religious clubs that meet in Sioux Falls School District facilities other than the school at which she teaches but constitutional as applied to prevent the Plaintiff from participating in religious clubs that meet at the school in which she teaches.

## JUDGMENT

In accordance with the Memorandum Opinion and Order entered on this date with the Clerk,

IT IS ORDERED, ADJUDGED and DECREED:

(1) that, other than the school at which the Plaintiff teaches, the Defendants are permanently enjoined from prohibiting the Plaintiff from participating in religious clubs that meet in Sioux Falls School District facilities; and

(2) that the Defendants' Religion in Schools and at School Activities Policy is unconstitutional as applied to the Plaintiff to prevent her from participating in religious clubs that meet in Sioux Falls School District facilities other than the school at which she teaches but constitutional as applied to prevent the Plaintiff from partici-

pating in religious clubs that meet at the school in which she teaches.